KNEVALS v. FLORIDA CENT. & P. R. CO. et al.

(Circuit Court of Appeals, Fifth Circuit. May 29, 1894.)

No. 179.

1. EQUITY JURISDICTION—REMEDY AT LAW—TRUSTS.
Complainant, holding corporate stock by assignment from pledgees thereof, filed a bill as their trustee, claiming that land held by defendant under a foreclosure sale of the property of the corporation did not pass by such sale, and was still liable for the debts of the stock. *Held*, that a court of equity had not jurisdiction on the ground of the trust alleged, as such trust did not relate to the subject of the suit, and the suit was virtually one to determine the legal title to land in defendant's possession.

2. SAME—PROPERTY OF DISSOLVED CORPORATION.
The evidence in such suit showed that the assignment of the stock to complainant was absolute, reserving no equities. *Held*, that jurisdiction in equity could not be maintained on the ground that the suit was to recover property of a dissolved corporation, as charged with an implied trust, the question between complainant and defendant being merely the enforcement of a legal title.

3. RAILROAD COMPANIES—SALE ON FORECLOSURE OF MORTGAGE—BURDEN OF PROOF.
On a general foreclosure sale of property of a railroad company, certain land belonging to it passed to the purchasers, and remained for years under

their control. *Held*, that the burden was on one alleging that it did not pass to show that it came within some exception.

**4. SAME—DECREE FOR SALE.**

A decree in a foreclosure suit, after declaring that complainant had a first lien on "the railroad and all property, rights, and franchises thereto appertaining," ordered a sale, mentioning only the railroad. *Held*, that this covered the entire property of the company connected with the use and purpose of the road.

**5. SAME—BONDS AND MORTGAGES—LAND APPERTAINING TO RAILROAD.**

The statute under which state bonds were issued to aid a railroad made them a lien on the road and on all property of the company, real and personal, appertaining thereto, which it had or might afterwards acquire. With part of the proceeds of such bonds, the company purchased land for terminal facilities, and occupied for such purposes part of the land and an extension thereof built out into the water on which it fronted, using such extension more than the original land; but no intention was shown to abandon the appropriation to such purposes. *Held*, that no part of the land should be excepted from the lien of the bonds, although certain portions might be detached and sold without causing immediate inconvenience to the railroad.

**6. ESTOPPEL—REPRESENTATIONS—ACQUIESCENCE.**

At a foreclosure sale of property of a railroad company, one who, after the decree of foreclosure, had bought nearly all the stock, and had become president of the company, purchased the property as sold. In articles of association of a new company, he recited that he and his associates had purchased all the franchises, rights, privileges, and property, of every description whatever, belonging to the old company, and he conveyed the same to the new company by deed in like terms; and the new company issued and sold bonds to a large amount, into the security for which this property entered. During the seven years following, numerous transfers of the property occurred, he acquiescing in the possession and control thereof by the purchasers. *Held*, that one taking, under assignment from him, his shares in the old company, was estopped from claiming that a very valuable portion of the property of that company did not pass by the foreclosure sale.

Appeal from the Circuit Court of the United States for the Northern District of Florida.

This is a suit by a bill in equity by Sherman W. Knevals to recover certain lots of lands in the city of Jacksonville, Fla., now held as the property of the Florida Central & Peninsula Railroad Company. The circuit court dismissed the bill, and complainant appeals.

On June 24, 1869, the legislature of Florida passed an act entitled "An act to perfect the public works of the state;" and on February 28, 1870, this act was amended. These acts authorized the Jacksonville, Pensacola & Mobile Railroad Company, a company incorporated by the laws of that state for the purpose of building a railroad west from Quincy, Fla., to extend its road through to Mobile, Ala., and in order to assist in building a continued line of road from Jacksonville, Fla., provided an exchange by that company of its bonds for a like amount of state bonds, and further provided that "the state of Florida shall by this act have a statutory lien * * * on the part of the road for which the state bonds are delivered, and on all the property of the company real and personal appertaining to that part of the line which it may now have or may hereafter acquire, together with all the rights, franchises and powers thereto belonging." And in a subsequent section it was provided that the governor should deliver to the president of said company coupon bonds of the state, to the amount of $16,000 per mile, upon receiving from him first mortgage bonds of like amount on any part or portion of the road between Quincy and Jacksonville. The portion of this road from Lake City to Jacksonville was, at that time,

the property of the Florida Central Railroad Company. Subsequently, the Florida Central Railroad Company issued its bonds to the amount of $1,000,-000, and they were exchanged for the same amount of bonds of the state, which were delivered to the president of the Jacksonville, Pensacola & Mobile Railroad, and sold by the officers and agents of such road. In the resolutions of the board of directors authorizing the issue of these bonds, they excepted from the lien so created certain lots situated in the city of Jacksonville, not used for depot purposes. Subsequently, in 1877, in negotiating a loan, there was excepted from the mortgage to secure the same a portion of the same lots, making the boundary line of the mortgaged property 125 feet south of Bay street, instead of along that street, which was the boundary of the railroad property. The state bonds exchanged for the railroad bonds having been sold, and the railroad having defaulted in payment, in a suit brought by the purchasers and holders of such exchanged and outstanding state bonds in the case of J. Fred. Schutte and others, complainants, v. The Jacksonville, Pensacola & Mobile Railroad Company and The Florida Central Railroad Company et al., in the circuit court of the United States for the Northern district of Florida, 31st of May, 1879, it was declared by Mr. Justice Bradley that the complainants in that suit had a first lien upon the railroad running from Lake City to Jacksonville, and all property, rights, and franchises thereto appertaining, to the amount of said bonds; and the same was advertised and sold, under said decree, by the special masters, on the 6th day of January, 1882, and a deed of conveyance made, on the 18th of that month, of "the Florida Central Railroad and all its property, privileges, rights, and franchises." At that time a part of the property of said railroad consisted of the several lots of land heretofore mentioned as situated in the city of Jacksonville, a portion of each of which was used for railroad purposes and terminal facilities, but which were more extensive than was required for that purpose at that time. Subsequent to the decree of Mr. Justice Bradley in the said Schutte Case, and previous to the sale under it, an arrangement was entered into between certain parties,—Sir Edward James Reed, Philip Roddy, and C. L. Williard,—for the purpose of securing possession of the stock of the Florida Central Railroad Company looking to a reorganization of it, in which it became necessary to procure more money, which they did by borrowing, December 5, 1881, $80,000 from Donnell, Lawson & Simpson, a firm of bankers in New York, pledging, as collateral security for the payment of the same, $138,-000 of the first mortgage bonds of the Florida Transit Railroad Company, another railroad company of that state, and reserving in the agreement of pledge the right, at any time, to substitute for such security 5,110 shares of the capital stock of the Florida Central Railroad Company, or $380,000 of the first mortgage bonds of said Central Railroad Company, and authorizing said Donnell, Lawson & Simpson to sell the collaterals so pledged, without notice, at the board of brokers, and become purchasers at said sale. A little more than a month after this loan and deposit of collaterals was made, the road was sold under the aforesaid decree, and Reed became purchaser, and finally, in the reorganization of the new company, the Florida Central & Western, which followed, he became president, and Lawson, of the firm of Donnell, Lawson & Simpson, one of the directors. Subsequently the road was in the possession of several receivers and trustees, and was finally sold to other parties, from whom it passed to the present owner, the appellee herein. The possession of the lots in question passed with the title of the road, and they have ever since been used, occupied, leased, or rented by the company owning the road, and treated and considered as being property of the company and belonging and appertaining to it.

Whether the loan of the $80,000 borrowed from Donnell, Lawson & Simpson was ever paid is in question. It was denied in the general denial of the allegations of the bill, and no direct evidence given in regard to it. Nor does it appear what disposition was ever made of the collaterals deposited with them, or whether any substitution of stock or bonds of the Florida Central Railroad Company was made for the bonds of the Florida Transit Railroad Company which the articles of agreement show to have been pledged. The evidence shows that the bonds originally deposited were in their hands as late as 8th of July, 1882, and any substitution or pledge of

the stock must have been made, if at all, after that. · The only thing positive is complainant's possession of the agreement acknowledging the loan and pledging the collaterals, and the possession of 700 shares of the stock of the company. The complainant, by his bill, alleged that he was a creditor of Donnell, Lawson & Simpson, and that he had received a transfer of the obligation or agreement of Reed, Roddy, and Williard with them, and filed this bill as their trustee, and acting in behalf of all the stockholders of the Florida Central Railroad Company, and claimed that, under the collaterals deposited to secure the debt, he was holder of 700 shares of the stock of the Florida Central Railroad, as originally organized, and that he had an equitable claim upon 4,410 more shares of said stock, and that the lots in question, situated in Jacksonville, although the property of said Florida Central Railroad Company, did not appertain to the railroad, and did not pass to the purchaser by the foreclosure sale, and were still liable for the debts of said stock and his claim, and prayed an accounting of the rents and profits received, and that the court would issue an injunction restraining the defendant from committing waste, and appoint a receiver to take possession of the said lots. On the 18th of January, 1889, this bill was filed, and upon a hearing, April 15th, it was dismissed, from which decree of dismissal an appeal has been taken, appellant assigning as error: The dismissing the bill, (1) inasmuch as no rights had been lost by the laches of complainant; (2) that the defendant had never obtained any title to the property in question under the judicial sale made on the 18th of January, 1882, and that no title passed under such sale, nor were such properties sold thereby,—and because complainant alleged a case entitling him to the relief prayed for, and that defendants did not establish any title to the properties in question.

H. Bisbee, for appellant.

W. W. Howe, S. S. Prentiss, and John A. Henderson, for appellees.

Before McCORMICK, Circuit Judge, and LOCKE and TOULMIN, District Judges.

LOCKE, District Judge (after stating the facts). The contention of the complainant in this suit is that the lots in question did not appertain to the railroad at the time of the sale of the railroad property on the 6th of January, 1882, and therefore did not pass to the purchaser, but remained the property of the Florida Central Railroad Company and its stockholders. The grounds of the defense are: First, that the complainant has no standing in a court of equity, but that he should have brought an action of ejectment to try title at law; second, that the property in question, the lots in Jacksonville, did appertain to the railroad, and passed by the sale under the deed of foreclosure; and, third, that complainant is estopped from setting up title. Although it was strongly contended by the defendant that the complainant was not entitled to the remedy prayed for in a court of equity, but that he should resort to an action of ejectment in a court of law, we fail to find the point discussed at length in the able brief of the complainant, and it was but lightly touched upon in the oral argument. The two grounds upon which it is presumed that the suit has been brought in equity rather than law are: First, that the complainant alleges that he was acting as trustee, with but an equitable title in part of the stock upon which he was suing; and, second, that he was attempting to recover property of a dissolved cor-

poration. The allegations of the bill would appear to give to the alleged trustee some equitable right in 4,400 shares of the stock, which might justify an appeal to a court of equity, but we fail to find any evidence of the substitution of the 5,100 shares of stock to replace the pledge of the $138,000 of bonds, or any promise or agreement to make such substitution. The right of substitution was reserved by the borrowers, Reed, Willard, and Rody, and no equitable or other interest was conveyed to Donnel, Lawson, and Simpson in the stock of the Florida Central Railroad Company until such substitution was made. The possession of 700 shares, and no more, creates rather a presumption that the substitution was never made, and particularly when taken in connection with the fact that the 138 bonds pledged were still in possession of Donnell, Lawson & Simpson as late as July, 1882, after the sale of the road, and the apparent utter worthlessness of the stock, and when the bonds may have been presumed to have some value, as the Transit road was still a running road. But if any pledge had been made, and an assignment to complainant of the shares so pledged, Mr. Lawson, the assignor, says it was an absolute assignment, with no equities reserved. This was also the nature of the assignment from Reed, and the character of complainant as equitable trustee disappears, and he stands as legal assignee, with no equities intervening. It is not that a trust may be indirectly, or in some way, connected with the suit, or that complainant or defendant may call himself a trustee for some third party, that gives to a court of equity jurisdiction. It is only where a trust or trust estate is the subject-matter of the suit, as such trust estate, that a trustee can resort to equity. In this case, until the property in question should come into the control or possession of the trustee, it could in no way be considered a trust estate. No relation of trustee and cestui que trust exists between complainant and defendant herein. The relation of trustee, alleged to be existing between complainant and his assignors of the stock in whose behalf he is suing, does not so make him a trustee, in regard to this property, as to enable him to resort to a court of equity. In Knox v. Smith, 4 How. 315, the complainant sought to protect himself against what he held to be a fraudulent trust deed, but the court failed to find anything which authorized a court of equity to take jurisdiction of the case. In Fussell v. Gregg, 113 U. S. 550, 5 Sup. Ct. 631, complainant alleged equitable title, but desired possession. The court held that a court of equity could not give that redress. In Killian v. Ebbinghaus, 110 U. S. 568, 4 Sup. Ct. 232, complainant alleged himself to be a trustee, and brought suit for possession of property, and an account of rents and profits, but the supreme court decided that, he claiming the legal title, and the defendant being in possession, the issue could only be tried in an action at law. In Hipp v. Babin, 19 How. 271, although the complainants were suing for the use of others as well as themselves, or, in other words, were acting in the capacity of trustees to obtain possession of the property sued for, the court held that the suit, being for the possession of land which they claimed by legal title, as against

others in possession also claiming by legal title, was properly for a law court, and a court of equity had no jurisdiction in the matter. This suit is virtually one to determine the legal title to land in the possession of defendant, and cannot, therefore, on account of the character of complainant or cause of action, be considered in a court of equity.

The second ground upon which it may be considered that a court of equity might entertain jurisdiction of the case is that the complainant was seeking to recover the property of a dissolved corporation. The principle upon which courts of equity take jurisdiction of causes in which it is sought to follow the property of dissolved corporations, in behalf of creditors of that corporation, is that such property, where held by a legal title, is charged with an implied trust to pay such indebtedness. But it cannot be claimed that this property is so charged. The complainant, as assignee of a pledgee of such stock, can have no greater rights in bringing suit than could his assignor or the pledgee, and certainly such pledgee can have no greater rights than his pledgor, as no party can convey to others greater rights than he has himself. Trask v. Railroad Co., 124 U. S. 515, 8 Sup. Ct. 574. Nor can the stockholders of a company, as such, have greater rights in obtaining possession of corporation property than the corporation might have, if in existence. When it appears that the interest which the complainant has in the shares of stock, instead of being equitable, as alleged in the bill, has become legal by a conveyance and assignment, as shown by the evidence, every equitable feature disappears from the suit, and, whatever equities might be urged as between the complainant and his cestuis qui trustent, as between him and the defendant there is but the enforcement of a legal title. Hayward v. Andrews, 106 U. S. 672, 1 Sup. Ct. 544. In the case of Howe v. Robinson, 20 Fla. 352, cited by complainant in the support of his right, it was the lien of a prior judgment that was sought to be enforced, and not a legal right. But in this case we fail to find any equitable title whatever. We consider, therefore, that it would be beyond the jurisdiction of a court of equity to grant the relief prayed, although it might be competent to appoint a receiver for the purpose of bringing an action at law to determine the legal title. Whether this court should reverse the judgment below dismissing the bill, and direct such appointment, and that the case be permitted to proceed, depends upon the other questions involved.

It has been considered by both parties that the question as to whether these lots in question appertained to the railroad, and therefore passed by the sale, is the important one in the case. Our views do not coincide with those of the complainant, that the burden of proof upon this point is upon the defendant to show that the property passed by the sale, but, the sale being proven and being general, purporting to convey all the property, rights, and franchises of the railroad, and the possession having passed with the sale, and the property being now, and having been for years, in the control of the defendants, and a great part of each lot occupied for railroad purposes, we consider the burden to be upon the

complainant to show that it came within some exception, and did not pass. It is contended by the complainant that the language of the fifth section of the decree ordering the sale only mentioned the railroad, and ordered that that alone be sold. But all parts of the decree must be considered together, and, in the third section, it declared that the complainants in that case had a first lien upon "the railroad, and all property, rights, and franchises thereto appertaining," and it cannot be accepted that, after declaring such a lien, the order to sell was intended to cover less than had been specified as being contained in it. The term "railroad," with no further specifications or modifications, we consider may well be taken as covering the entire property of the company connected with the use and purpose of the road. And particularly do we consider it should be so understood in this case, and extend, certainly, as far as the lien has been declared. It is also claimed by the complainant that the language of Mr. Justice Bradley, in his opinion in the Schutte Case,[1] in which the decree of foreclosure and sale was rendered, recognized as valid the exception found in the resolution of the board of directors in authorizing such bonds, excepting from the lien "the lots in the city of Jacksonville not used for depot purposes." We cannot accept this view of the case, nor do we consider that in quoting the language of the resolution he had any intention of giving force to that portion of it. The language of the statute was that the bonds should be a statutory lien on the part of the road for which the state bonds were delivered, and on all property of the company, real and personal, appertaining to that part of the line. No resolution of the board of directors limiting the character or extent of the lien was embodied in the bonds, nor could it affect the lien given by this statute, if they saw fit to issue them. Mr. Justice Bradley expressly states that the lien was created by the statute, and in no way, do we consider, intimates that the action of the board of directors influenced that lien. He said: "Of course, it would be for the Florida Central Railroad Company to prescribe the conditions or considerations on or for which it would issue such bonds. It had the power to do it." Then adds: "If done, and the exchange should be made, * * * this would not relieve the Florida Central Railroad Company from its obligations arising upon its bond." The conditions and considerations might be considered in issuing them; that is, there was no power to compel them to issue them, and they might dictate their disposition, but when once issued, and exchanged for state bonds, no condition could relieve them from the lien of the statute under which they were exchanged. Nothing said by him can, in our opinion, be construed into an intimation whether those lots were or were not property appertaining to the railroad; and such view would be utterly inconsistent with the language of the decree, which should have excepted them from sale if that was his view of the law. The question, then, is, did these lots appertain to the railroad?

[1] Fed. Cas. No. 12,492a.

In considering this question, there is nothing that can appeal to a court of equity as a reason why they should not be considered as so appertaining to said railroad, and be reserved from the sale. The proceeds of sale of the bonds for which the lien was declared had come into the hands of holders of the stock of the Central Railroad. The party moving the resolution in which the exception was made, M. S. Littlefield, representing 3,350 shares of the stock at that meeting, and Edward Houston, representing 1,310 shares of the stock, received the bonds, and disposed of them in accordance with an agreement between themselves, and used the proceeds. These lots were partly paid for with funds thus procured. Even in the absence of a positive lien, a court of equity might well hold them subject to an equitable lien in favor of the holder of the bonds whose money could be traced to them. When the road was sold it was hopelessly bankrupt, and its stock, particularly that represented by the complainant, was in the hands of those who had purchased it subsequent to the decree of foreclosure, and with full knowledge of all the facts. There were a large number of debts outstanding against the company, even after the sale of its property, and there are no equitable grounds why there should be anything left for the stockholders. This, though, cannot affect the validity or invalidity of the sale. In the various cases which have arisen where the question was whether or not certain property was appurtenant to the railroad, it has come up in different ways. In some it has been a question of exemption from taxation, and then it has been claimed that it required a strict construction. In others it has been a question between mortgagees and unsecured creditors, in others between purchasers and lienholders, and in such cases a liberal construction has been given. But, in each of these cases, whether or not the property was appurtenant to the railroad has been held to be a question of fact, and, where the trial was at law, to be submitted to the jury. Railroad Co. v. Livermore, 47 Pa. St. 465. The general term of a "railroad," as ordinarily used, includes many kinds of property, both real and personal, and cannot, with any degree of propriety, be confined to the track, or the land, simply, necessary to lay the track upon. It is not necessary to consider whether the land can pass as appurtenant to land, for it is unquestionable that land may pass as appurtenant to a railroad. It is claimed that nothing can be appurtenant to the railroad unless it is necessary for its operation. Here the term "necessary" may be used with several significations and limitations, and we do not consider that its most restricted and confined use should be accepted in this connection. It can at no time be claimed that a strip of land 100 feet wide, or 200, as is frequently granted by charter, is absolutely necessary for the laying of a track and the operation of a railroad; and yet it is considered that it is reasonably necessary and appurtenant to the road and all passes with it. A careful examination of the numerous authorities cited satisfies us that any piece of land that may be considered reasonably necessary for the present operations of the road, or contemplated and prospective extensions or improvements, and held for that purpose, may, within the scope of the

decisions, be held to appertain to a railroad. . We find no case to
which such principle may not be applied without conflict.    In Rail-
road Co. v. Livermore, supra, the lots of land, across the mere edge of
some of which the track was laid, but which were not in any other
way used for railroad purposes, but which had been held for many
years, and the original intention of occupancy abandoned, were held
by a jury not to be appurtenant to the railroad, and that finding ap-
proved.

In that case the conduct of those interested, from the time
of the mortgage and the sale up to the time of the suit, was
reviewed, and, in closing, the court says:  "These remarks are
not to show a ratification of a void sale, but, by the united
conduct and understanding of all the parties, that no actual ap-
propriation of the lots has ever been made, and that the sale was
valid."   The same examination in this case would, we think,
show, by the united conduct and understanding of all parties,
that there was an actual appropriation of the lots to railroad pur-
poses, and, although not all were required for immediate use, such
appropriation has never been abandoned, or the idea entertained
that any portion of the property had been or would be separated
from the railroad, as held for actual use, and not for speculative
purposes.   We cannot accept the view that nothing passed by the
mortgage sale except that property which was the property of the
road at the time of the enactment of the statute.   The railroad was
a continuing property, and after-acquired property and rights which
became merged into it, and appropriated for its purposes, became
subject to its lien.   The lots were purchased for the purpose of fur-
nishing terminal facilities where a contemplated extensive system
of roads was intended to reach the deep water of an Atlantic port.
Although stretching along one street something over 1,200 feet, the
depth of these 12 lots, or distance back from the street to the water,
varied, as appears by the maps filed in the case, from about 125
feet to about 200 feet; and, had the road laid its tracks on the dry
land of the lots, they would have been occupied for the entire sur-
face, but, being water lots, the railroad was built out, by wharves
and piers and by taking earth from some of the lots and filling in,
until much of the railroad business is transacted on the extension
of these lots.   The map shows 11 lines of tracks running over and
across these lots or their extensions, with passenger station, freight
houses, platforms, etc.  Has the railroad company, by thus extend-
ing and enlarging these lots, and using more generally the extension
than the original land, abandoned the original appropriation, and
lost the right to have them considered and treated as railroad ap-
purtenances?   We consider not.   The riparian rights went with
them, and have not been separated from them.   The very occupying
and extending them for railroad purposes was, we consider, an ap-
propriation.   It is true that certain parts of them might be detached
and sold without the railroad's suffering any immediate inconven-
ience, and the same is probably true of a strip of land 25 feet wide
on each side of the track for the entire length of the railroad, but
that would not show that it did not appertain to it.   The testimony

shows that it has never been the intention to abandon the appropriation, but that there has always been in view the time when the entire property will be required, as not only convenient, but absolutely necessary, for the purposes of the railroad. It has been treated, held, received, and used and occupied, by all having anything to do with it, as appurtenant to the railroad, and we fail to find by the evidence that it, or any portion of it, should be excepted from the lien of the mortgage or foreclosure and sale.

But the remaining ground of defense against this suit we consider more positive than that the lots were appurtenant to the railroad. Subsequent to the decree of foreclosure of the mortgage under which the sale of 1882 took place, Sir Edward J. Reed purchased, and was, at the time of sale of the road, owner of 5,110 shares of the stock of the railroad, out of a total of 5,500 shares, and was president of the company. At the sale he purchased the property as sold, and in the organization of the new company, on the 8th day of February, 1882, in the articles of association he recited that he, and those associated with him, had purchased all the franchises, rights, privileges, and property of every description whatever belonging to the Florida Central Railroad Company. This was a positive recital, made in a public document, to be placed on file as the foundation of the incorporation of a new company, to which Reed conveyed by deed all the property thus purchased, and upon the strength of which bonds to the amount of upwards of $2,000,000 were issued and sold. We do not find in the record a copy of the deed from Reed to the newly-organized company, the Central & Western, but in the minutes of the board of directors at which it was presented and entered we find that it is stated as having granted all the rights, privileges, franchises, and property of every description belonging to the aforesaid railroads, one of which was the Florida Central. Reed was at this time the sole owner of the shares of stock in whose behalf this suit is brought. There had, at that time, been no pledge or substitution of any of these shares of stock for the bonds of the Transit Railroad Company, as these bonds were in the hands of the creditors, Donnell, Lawson & Simpson, as late as the 8th July, that year, and by such recital in the articles of the association and the deed of conveyance, and his acquiescence in the possession and control for seven years of said lots, and the numerous transfers of the property, in one of which they are distinctly described as "all the terminal property of said railroad at Jacksonville," until large amounts of bonds have been issued and sold, into the security of which these lots have apparently entered as being railroad property, and so held and occupied, and other interests have intervened, we consider that Reed, or any one claiming by, through, or under him, is estopped from now saying that he only purchased at that sale a part of the property of said railroad, and that a very valuable portion of it yet remains the property of its stockholders, he holding all but one-thirteenth of it. No one taking from him any interest in these shares subsequent to these recitals can take any greater right than he had. Trask v. Railroad Co., 124 U. S. 515, 8 Sup. Ct. 574.

Our conclusion is that upon the first point complainant is not

entitled to the remedy sought, nor should he have a decree upon either of the other points, and the decree of the circuit court is affirmed. But it appearing that the record contains much unnecessary, immaterial, and irrelevant matter, a portion of which, at least, is directly chargeable to the appellee, the costs of the record, and printing the same, may be equally divided between the parties to this suit; and it is so ordered.