No. 29,155.

WINFIELD SMOUSE, *Appellant*, v. THE KANSAS CITY SOUTHERN RAILWAY COMPANY, W. R. HONNELL, A. G. DENGEL and JAMES L. BEGGS, *Appellees*.

(282 Pac. 183.)

Opinion filed November 9, 1929.

J. E. McFadden, O. Q. Claflin, Jr., of Kansas City, E. C. Eicher, of Washington, Iowa, and Samuel R. Freet, of Kansas City, Mo., for the appellant.

E. S. McAnany, M. L. Alden, T. M. Van Cleave, all of Kansas City, Frank H. Moore, Cyrus Crane, C. R. Hall and A. F. Smith, all of Kansas City, Mo., for the appellees.

The opinion of the court was delivered by

HARVEY, J.: In this action plaintiff sought to enjoin the railway company from condemning a portion of his real property on the ground that the railway company sought to take the property not for its own use, but for the use of a private corporation which does not possess the right of eminent domain. After a hearing the court denied the injunction, and plaintiff has appealed.

Plaintiff's petition, in addition to formal parts, alleged that in May, 1929, the defendant railway company presented its written application to the district court of Wyandotte county alleging that it was necessary for the proper construction, operation and maintenance of its line of railroad then located in Wyandotte county to acquire land for sidetracks, depots, work shops, water stations and additional yard facilities to be used in the operation of its railway. The application described by metes and bounds an irregular tract of land containing .38 of an acre. It is further alleged that the application requested the court and the judge thereof to appoint commissioners to lay off and condemn the property for the use and purposes aforesaid, and that the judge of the court had appointed three commissioners who had given the required notice and were about to condemn the property and assess plaintiff's damages. Plaintiff further alleged that he was the owner of the described land, that the railroad company was not in fact attempting to condemn all of the described land for the purposes recited in its application, but in fact was seeking to condemn a strip of land 18 feet wide and approximately 233.53 feet long, being the northerly portion of the described tract, for the purpose of providing an easement or right of way over the surface thereof for the use and benefit of the Philadelphia Quartz Company, a private corporation, which does not possess the right of eminent domain, and for the further purpose of giving to the quartz company an easement under the surface of the strip of land for pipes, pipe lines, sewers, conduits, and for other purposes, and that it was the plan of the railway company to condemn the 18-foot-wide strip for the purpose of trading it to the quartz company for certain rights of way, or other property rights, of the quartz company which the railway company desired to acquire. It was further alleged that the procedure of the railway company was contrary to law, was in excess of its right of eminent domain, and an attempt to take the private property of plaintiff for the private purposes mentioned, and to deprive plaintiff of his property without due process of law, contrary to the fifth and fourteenth amendments of the constitution of the United States and the laws of the state of Kansas.

The answer of the railway company admitted the formal parts of the petition and that it had made the application mentioned in plaintiff's petition for the condemnation of the real property therein described, and that commissioners had been appointed who had given notice and were proceeding to condemn the land in accord-

ance with the application and the order of the court, and to assess the damages therefor, and that plaintiff was the owner of the real property in question. The railway company denied in its answer that it was not in good faith attempting to condemn all of the land for the purposes recited in its application and the order of the court, denied that it was seeking to condemn the strip 18 feet wide and approximately 233.53 feet long for the purpose of providing an easement or right of way for the Philadelphia Quartz Company, a private corporation, and for the further purpose of giving the quartz company an easement under the surface for pipes, pipe lines, sewers, conduits and other purposes, further denied that it was the plan of the defendant to condemn the 18-foot strip for the purpose of trading or bartering the same to the quartz company for certain rights of way of the quartz company which the railway company desired to acquire, and denied that the procedure by which it attempted to condemn the property is contrary to law, or in excess of its rights of eminent domain, or is an attempt to take the private property of plaintiff for private purposes, or to deprive plaintiff of his property without due process of law. Further answering, defendant alleged that in May, 1906, it acquired a 15-foot strip of land for railroad purposes south of and contiguous to a portion of the strip here in question on which it located a railroad track designated the "McAlpine avenue spur," which spur served several large industries; that in 1914 O. S. Snow, predecessor in title to the plaintiff to the land involved in this action, by warranty deed, conveyed to the Philadelphia Quartz Company 4.265 acres of land adjoining the land of plaintiff on the east; that thereafter Bessie Hoel, who succeeded to the title of Snow, conveyed to the quartz company an 18-foot easement over the ground now claimed by plaintiff and which is sought to be condemned by defendant, under the terms of which easement the quartz company was given a perpetual roadway for all purposes for which a roadway could be used in obtaining access to and egress from the 4.265-acre tract with Kansas avenue, one of the principal streets of Kansas City. The quartz company was also given the perpetual right to place and maintain water and gas pipes, sewer and pipes for the conveyance of its product from its plant to Kansas avenue and underground conduits for electricity and overhead wires and cables, with the necessary poles, for electric, telephone, telegraph, fire alarm and other wires, and these were made perpetually appurtenant to the 4.265-acre tract; that defendant, since acquiring its right of way in 1906, has maintained as a part of

its trackage system the McAlpine avenue spur, one of its principal lines of railroad in Wyandotte county, carrying interstate and intrastate freight and serving a large part of the industrial district of the city; that properly to serve the public it has become necessary to enlarge its trackage and yard facilities in the district served by the McAlpine avenue spur and to construct in the immediate future at least two main additional spurs with additional siding, and soon to construct a railroad yard in connection with the track; that plaintiff apparently holds the fee title to and is in possession of a tract, a part of which defendant is seeking to condemn, about 206 feet east and west, about 900 feet north and south, bounded on the north by the C., R. I. & P. railway yards, on the east by the Philadelphia Quartz Company, on the south by defendant's right of way, and on the west by the Southwest Milling Company, and containing approximately 4.199 acres; that defendant needs for railroad yard facilities .38 acres north of its present right of way and parallel therewith, but does not need and cannot use the remainder of plaintiff's land which plaintiff has asked defendant to buy at a price which it cannot afford to pay; that the defendant will need in the immediate future to provide a team track, and that a roadway paralleling the northerly track of its yards will be needed for that purpose and other railroad purposes; that on the land which defendant is seeking to condemn, and lying immediately north of its present track, the fee of which is claimed by plaintiff, the Philadelphia Quartz Company has the easement above mentioned. This easement is paved, and beneath it the quartz company has pipes for conveying water and gas to its plant and to give it sewage outlet, and pipes for conveying silicate of soda to Kansas avenue and thence to soap manufacturing plants, and also has overhead telephone and electric poles and wire; that to have the roadway over the tracks which defendant must construct would be dangerous to the public and to the employees of the railroad company and would interfere with interstate and intrastate commerce because of the public use thereof and interruptions incident to repairs and replacements; that by arranging with the quartz company so its easement could be transferred to the northern portion of the land which defendant seeks to condemn, the use of it by the quartz company would not seriously interfere with its use by defendant, would avoid the hazards of its attempted use in its present location, and would place no additional burden upon plaintiff.

Issues were joined on these allegations. The accompanying plat

will illustrate the location of the property sought to be condemned by defendant and its relation to the other tracts mentioned.

The property sought to be condemned includes that shown by the

wide black lines on the plat and the wedge-shaped tract surrounded by them. It may be described beginning at a point on the north line of the present right of way of the railway company and at the west side of the plaintiff's land, thence north 93.4 feet to a point 81 feet northwesterly from the north line of such right of way meas-

ured at right angles, thence northeasterly parallel with the north line of such right of way and 81 feet therefrom to the east property line of plaintiff's tract, thence south 42 feet to a corner in such property line, thence southwesterly on a curve to the place of beginning. The present means of ingress and egress to the quartz company property from Kansas avenue (which is perhaps 300 feet south of the southwest corner of the tract sought to be condemned) is along the roadway marked on the plat "A," "B," "C." This is a strip 18 feet wide, which plaintiff's predecessor in title had granted to the quartz company for a roadway and for underground pipes and conduits and overhead poles and wires, in which grant it was specifically provided that on request of the quartz company the grantors would cause the proper entries to be made on the county records and dedicate the same as a public highway. This, however, has not been done. The highway was paved. The business of the quartz company is preparing silicate of soda, principally used in the manufacture of soap. This is conveyed in liquid form through pipes laid under this highway to Kansas avenue, and thence to two large soap manufacturing plants, which have between two and three thousand employees, about a quarter of a mile west. Also under this highway are pipes for water and gas, much of which is used by the quartz company, and for sewage, and above the ground there are wires and poles for telephone, electric light and fire alarm. When the railway company found it necessary to increase its trackage and to plan to establish yards in this immediate locality it was confronted with the necessity of determining what to do with this highway from Kansas avenue to the quartz company. Its officers contemplated putting its tracks far enough apart that the highway could stay where it is, but that was found to be impracticable, for at the east end of the tract sought to be condemned the highway would cross the tracks diagonally. The traffic on the highway, the overhead poles and wires, and the necessity of the inspection, repair and replacement of underground conduits would be a constant hazard, interfering with the safe and efficient operation of the business of the railroad. To the east of the tract sought to be condemned, perhaps two blocks, the railway company has a house track for loading and unloading merchandise, but that business soon will have to be curtailed or discontinued at that place, hence it was planned to have a space on the north side of the property sought to be condemned for use as a means to get to the north side of its tracks and

yards and where its north track could be used for a house track. This space it could permit the quartz company to use, not only as a means of ingress and egress to its plant, but for its overhead wires and underground conduits, without seriously interfering with the operation of its railroad. It therefore took the matter up with the quartz company by correspondence and agreed, at its own expense, to move the poles and wires above the ground and the conduits underground to the north portion of the tracts sought to be condemned, and to permit the quartz company to use the passageway as a means of ingress and egress to its property, not interfering with the railroad operation. This would permit the ingress and egress of the quartz company property on the lines shown on the plat marked "A," "B," "D," "E." At the close of the evidence the court expressed the view that the use to be made by the quartz company of the land sought to be condemned should be considered as incident to the main idea of condemning the tract for railroad purposes, and denied the injunction.

Turning now to the legal questions involved. Since in a condemnation proceeding under the exercise of the right of eminent domain the principal question at issue is the amount which should be paid as damages for the taking of the property, injunction by the landowner is a proper remedy when he contends that the condemning party is exceeding its powers, or where it is contended that the condemnation is ostensibly for a lawful purpose but really for an unlawful or improper one, such as a private use, or when an unnecessary amount of property is sought to be taken. (20 C. J. 1167.)

The statute (R. S. 66-901) under which the railway company is seeking to condemn the property provides that the railway company may condemn a route for a proposed railroad "not exceeding one hundred feet in width, except for the purpose of cuttings and embankments, . . . and also such land as may be deemed necessary for sidetracks, depots and workshops and water stations, materials for construction, except timber, a right of way over adjacent lands sufficient to enable such company to construct and repair its roads and stations, and a right to conduct water by aqueducts, and a right of making proper drains."

It is argued by appellee that since its present right of way, 15 feet, plus the strip 81 feet wide, which it now seeks to condemn, is less than 100 feet as mentioned in the statute, the presumption is

that the entire width sought to be taken is reasonably necessary and appurtenant to the railroad, citing *Knevals v. Florida Cent. & P. R. Co.*, 66 Fed. 224, and 20 C. J. 634, 636. Appellant contends that the 100 feet in width mentioned in the statute applies to the main line of a railroad to be constructed, and that it has no application to the condemnation of land for additional sidetracks and yards such as is contemplated in this action. For the purposes of this case we shall regard this contention as being correct, but it must be noted that the portion of the statute applying to condemnation for sidetracks, etc., provides for condemning "such land as may be deemed necessary." The thought intrudes: By whom deemed necessary? Certainly it must be the managing officials of the railway company seeking to condemn the property rather than the property owner. We note, also, that the portion of the statute providing for condemning land for sidetracks, etc., includes the right to condemn "a right of way over adjacent land" sufficient to enable the company to construct and repair its road and station. Now there was evidence on behalf of the railway company in this case that its officials deemed it necessary to take all the land sought to be condemned for sidetracks, workshops and a right of way sufficient to enable the company to construct, repair and properly use its road. The judgment of the trial court in favor of the defendant was necessarily a finding in its favor on those questions, and there being evidence to support that finding it is binding on this court. We might predicate an affirmance of the judgment on this point alone.

But the real contention of appellant is that the officials of the railway company did not in good faith deem it necessary to take all of the land sought to be condemned for the purpose stated in the statute. This charge of a lack of good faith is tantamount to a charge of fraud or false pretense on the part of the officers of the railway company. To establish that the plaintiff necessarily had the burden of proof by evidence of a character and degree necessary to establish fraud or bad faith in a court of equity. In this connection appellee suggests that appellant does not come into court with clean hands, for the reason that by contracts made by his predecessor in title he is at least morally and equitably bound to see that the quartz company has a way appropriate for its use to and from Kansas avenue, or at least that he is morally and equitably bound not to oppose a reasonable provision made which enables the quartz company to have such a way. But we pass this question

by as deeming it not essential to the determination of the case. We must bear in mind that the statute authorizes the condemnation by the railway company of such land as it may deem necessary not only for sidetracks and workshops, but for a right of way over adjacent lands sufficient to enable the company to construct and repair its roads and stations, and necessarily to be used in the conduct of its business as a railroad. Hence, under this statute, if the sole showing was that the railway company was condemning a strip 18 feet wide more than was needed for its tracks and shops, and that it needed this 18-foot strip only for the purpose of a passage way to construct and repair and properly to use its railroad, the condemnation of all of the land would be within the purview of the statute.

To support the charge of bad faith on behalf of the railway company in condemning more land than it needed for railroad purposes plaintiff offered evidence, most of which was correspondence between the railway company and the quartz company, to the effect that the railway company planned to acquire by condemnation all of the land sought to be condemned and would, at its own expense, remove the poles and wires above the ground and the pipes and conduits under the ground which the quartz company has on its present way of ingress and egress to its premises to the northerly 18 feet of the property sought to be condemned, and would permit a way for such ingress and egress to the quartz company over that strip. The question really is: Does this evidence, taken in its broadest sense, constitute proof of fraud or bad faith on behalf of the officials of the railway company in condemning the 18-foot strip, being the northerly part of the property sought to be condemned? The trial court held in effect that it did not, and we agree with that conclusion. The officials of the railway company were confronted by an actual condition which had to be changed to insure the safe and efficient operation of its railroad. It could not put in the extra switch tracks and operate them safely and efficiently with this way of ingress and egress located where it is. Neither was it practical to attempt to relocate it between its spurs or switch tracks. The only practical thing to do was to put it off to one side. On considering the matter it was found that this could be done in such a way as to enable the railway company to have a right of way for passage on the north side of its tracks for the purpose of constructing them, repairing them, and the proper and necessary use

it would need to make of them, and that this strip could also be used for a way of ingress and egress to the plant of the quartz company. It bears much more the earmarks of a sensible, prudent arrangement than it does those of fraud or false pretense. The result is that the evidence offered by plaintiff to support the charges of bad faith is insufficient for that purpose.

Appellant argues that this evidence discloses that a private use as well as a public use is to be made of this property and that this renders the condemnation proceeding unlawful. It is well settled, of course, that even when a party has the right of eminent domain he cannot condemn the private property of an individual for the private use of another who does not possess the right of eminent domain. It is also quite well settled that where both a public and a private use is to be made of the·property sought to be condemned and the private use is the dominant, outstanding, or more important object of the condemnation, the proceeding must fail, and some of the authorities are to the effect that if the public and the private use are equal in importance there can be no condemnation. See authorities collected in the annotation 52 A. L. R. 9 *et seq.* But if the private use to be made of the property is inconsequential compared to the public use, or subordinate thereto to the extent that it can be said to be only an incident thereof, then the fact that such private use is to be made of the property will not defeat the condemnation. In *Irrigation Co. v. Klein*, 63 Kan. 484, 497, 65 Pac. 684, it was said:

"There is no question but that, if a private use is combined with a public one in such way that the two could not be separated, the right of eminent domain may not be invoked to aid the joint enterprise. We mean by this that the two purposes must together exist as main, or principal, ones; but where the private purpose is simply an incident, and the public use the principal, then the incident will not destroy or defeat the principal. That boats may be sailed upon an irrigation reservoir, or that fish may live therein, does not destroy or interfere with its use for irrigation. What is the principal, and what the incident, might in some cases become a question of fact, to be determined by the proper triers of questions of fact."

See, also, *Walker v. Shasta Power Co.*, 160 Fed. 856, 860, and *Eastern Oregon Land Co. v. Willow River L. & I. Co.*, 204 Fed. 516, 518, 519.

In the note, 53 A. L. R. 12, it is said:

"The general rule is well settled that the exercise of eminent domain for a public purpose which is primary and paramount will not be defeated by the

fact that incidentally a private use or benefit will result which would not of itself warrant the exercise of the power."

Many authorities are cited. On this point the trial court held that the private use in contemplation to be made of the property by the quartz company was inferior to the public use to be made of it by the railway company and amounted only to an incident to such use. There is evidence to support this view.

Appellant further contends that the real purpose on the part of the railroad was to save itself from a heavy claim of damages on the part of the quartz company. It is pointed out that the railway company might condemn the interests of the quartz company in its present way of ingress and egress to its premises and pay whatever damages would be occasioned thereby. The fact such damages might be large (such a taking of the property of the quartz company would in effect put it out of business) is no reason why it could not be done, and appellant contends that the railway company is really attempting to condemn a part of his land and turn it over to the use of the quartz company to lessen the amount of damages it would otherwise have to pay to the quartz company. In other words, that it is compensating the quartz company for the taking of its present right of way by condemning plaintiff's land and giving it to the quartz company for a new right of way; that it is compensating the quartz company by substituting a new right of way taken from plaintiff for the right of way it now has.

In this connection the thought suggests itself: Why should appellant be concerned with the amount the railway company pays the quartz company for the damages the quartz company will sustain by reason of the railway company taking the quartz company's present way of ingress and egress to its premises and other of its property, or with the manner of such payment? Appellant is primarily concerned with but two questions: *First*, that his property is being taken for a public purpose as distinct from a private one; *second*, that he receives reasonable compensation for his property taken by the railway company, a matter which will be determined in the condemnation proceeding rather than in this action. If the railway company, instead of taking outright the property of the quartz company and thus in effect destroying the usefulness of its plant and paying the heavy damages which would necessarily result from such a taking, by its officers negotiates with the officials of the quartz company and reaches an agreement by which the rights of

188

the quartz company in its way of ingress and egress to its premises will not be wholly destroyed, but will be relocated on some other part of the railway company's right of way where it will least interfere with the business of the railway company in performing its functions as a common carrier and thus reduce the loss that will be sustained by the quartz company, and of course its own liability to pay damages, such an arrangement is the business of the railway company and the quartz company. It is difficult to see how it is of any concern to the appellant. But appellant contends that this arrangement establishes the fact that the railway company is not taking his property for a public purpose, but taking it for a private purpose, to wit, the compensation of the quartz company for damages it would otherwise sustain. But this conclusion does not necessarily follow. It may still be true, as the court below found in this case, that the contemplated use by the quartz company of property which the railway company seeks to take from plaintiff is incidental only to the railway company's use of it. There are substantial authorities to support this view.

What is perhaps regarded as the leading case was decided by the supreme court of Maryland, *Pitznogle v. Western Md. R. R. Co.*, 119 Md. 673. In that case the railway company, because of an increase in its business, found it necessary to increase its switches, yards and sidetracks. A part of the ground necessary to be used for that purpose was then occupied by a private road from certain farm properties to the pike. In its application for condemnation of the property deemed necessary for its purposes the railway company alleged that it desired to acquire the land "to be used for the purpose of locating its railroad tracks, switches, yard tracks and sidetracks . . . on part of the same, and for the location of a substitute private road on the remainder thereof, in place of the existing private road which the petitioner desires to close and to use for railroad purposes." It was contended that the use of a part of the land for the location of a private road in substitution for the existing private road which was to be closed and used by the railway company for railroad purposes is a private use of the land. This contention was not sustained. The court said in the opinion:

"It is shown that the whole of this intervening space, including the road or way thereon, is required for railroad purposes, that is, for laying the tracks, sidetracks and switches of said road. . . . Without the use of this road or private way for the purposes that we have mentioned, the plaintiff would be defeated in its proposed plan of straightening its road and of enlarging its

yard. . . . The condemnation of a part of this land, here sought to be condemned, for a substitute private road or way is incident to and results from the taking, by reason of public necessity, of the existing private road for public use, and the use of it for such purposes should, we think, be regarded as a public use within the meaning of the constitution." (p. 679.)

The syllabus reads:

"Where a railroad company having power of condemnation sought by apt proceedings to acquire certain land, including a strip on which to open a new private road to replace a private road which it wished to close, in order to widen its right of way and provide additional tracks, etc., it was *held,* that it could not be objected that the strip of land so acquired would not inure to the public service nor tend to promote public use nor have relation to the public welfare and convenience."

Appellant points out that this case is reported in 46 L. R. A., n. s., 319, with an annotation the author of which criticizes the judgment as being unsound. But we note that the decision has been cited approvingly by the supreme court of the United States in *Brown v. United States,* 263 U. S. 78, 83, also by the supreme court of Pennsylvania in *Foley et al. v. Beech Creek Ext. R. R. Co.,* 283 Pa. 588, and by the supreme court of Michigan in *Fitzsimmons & Galvin, Inc., v. Rogers,* 243 Mich. 649. This judicial approval outweighs the adverse criticism of the annotator above mentioned.

In *Brown v. United States,* supra, the dam for a government irrigation project on Snake river in Idaho was so situated that the reservoir would flood about three-fourths of the town of American Falls. Congress passed an act authorizing the department in charge of the work—

". . . to purchase or condemn and to improve suitable land for a new townsite to replace the portion of the town of American Falls which will be flooded by the reservoir, and to provide for the removal of buildings to such new site and to plat and to provide for appraisal of lots in such new townsite and to exchange and convey such lots in full or part payment for the property to be flooded by the reservoir and to sell for not less than the appraised valuation any lots not used for such exchange." (p. 80.)

The government sought to condemn the plaintiffs' land under this statute for a part of the new townsite. Plaintiffs contended that the power of eminent domain did not extend to the taking of one man's property to sell it to another, that such an object could not be regarded as for a public use of the property, and without this appropriation could have no constitutional validity. This contention as applied to the case was denied. The court said:

"The purchase of a site to which the buildings of a town can be moved and

salvaged and the dispossessed owners be given lots in exchange for their old ones is a reasonable adaptation of proper means toward the end of the public use to which the reservoir is to be devoted. The transaction is not properly described as the condemnation of the land of one private owner to sell it to another. . . . A method of compensation by substitution would seem to be the best means of making the parties whole. The power of condemnation is necessary to such a substitution." (pp. 82, 83.)

The pertinent headnote reads:

"Where establishment of a reservoir under the reclamation act involved flooding part of a town, the United States had constitutional power to take by condemnation other private land near by, in the only practicable and available place, as a new townsite to which the buildings affected could be moved at the expense of the United States and new lots be provided in full or part satisfaction for those flooded. The fact that, as an incident of such a readjustment, there may be some surplus lots of the new townsite which the government must sell, does not characterize the condemnation as a taking of one man's property for sale to another."

In *Fitzsimmons & Galvin, Inc., v. Rogers*, supra, the state highway department was engaged in the construction and improvement of a state trunk-line highway which was an extension of one of the principal streets of Detroit. The highway was to be increased to 200 feet in width, and for that purpose it was necessary to acquire adjacent property. For a distance of 9.1 miles the right of way of a railroad lay adjacent to the highway. It became necessary to acquire this right of way to carry out the plan of widening the highway. The legislature passed an act authorizing the governor to negotiate with the railway company for the relocation of its railroad right of way and empowered the highway commissioner to acquire, by purchase or condemnation, ground for the relocation of the railroad right of way. The question of the validity of this statute and the proceedings under it were before the court. The court stated:

"We have squarely before us the question as to whether under the highway act there can be what may be termed substituted condemnation, or compensation by substitution." (p. 658.)

The court referred to the cases of *Brown v. United States,* supra, and *Pitznogle v. Western Md. R. R. Co.,* supra, and said:

"Having in mind that the primary purpose of the act . . . was that of highway construction and improvement, and that the relocation of the railroad right of way was inseparably connected with the project, we hold that the working out of the whole problem was properly delegated by the legislature to the state highway department under the terms of the contract embodied in the statute." (p. 660.)

In *Foley et al. v. Beech Creek Ext. R. R. Co.*, supra, the court had before it the validity of a statute providing, in substance, that if a railroad, in order to acquire property necessary for its use found it necessary to take a public road, it might condemn land for the purpose of relocation and construction of the highway. The court held the statute to be valid as a necessary incident to the acquisition of the land needed for railroad purposes.

We have not overlooked the case of *City of Cincinnati v. Vester*, 33 F. (2d) 242 (and *In re Opinion of the Justices*, 204 Mass. 607, and other allied cases), where it was held:

"Excess condemnation of land by city in widening of street for purpose of selling such excess at a profit, and using proceeds to pay for improvement, *held* not condemnation for a 'public use' within const. Ohio, art. 18, sec. 10, and is in violation of the due process clause of the federal constitution."

In our view the rules of law stated in these decisions are not applicable to the case before us.

Lastly, appellant argues that in no event does the railroad company have the right to condemn more than the surface of his property for railroad purposes, and has no right to condemn his property for the purpose of relocating underground pipes and conduits. We note that in the rights of condemnation conferred by our statute (R. S. 66-901) is the "right to conduct water by aqueducts and the right of making proper drains." We see no reason why this is limited to the surface, or above the surface. We think that the word "aqueduct" as used in the statute includes underground conduits, and that "proper drains" may be underground pipes as well as drainage on the surface or above it.

From what has been said it necessarily follows that the judgment of the court below must be affirmed. It is so ordered.