114 So.2d 171 (1959)
R.T. HERR, Kenneth Norris, D.G. Tatum, Dorothy J. McAvoy and Walter L. Heuman, Appellants,
v.
CITY OF ST. PETERSBURG, a Municipal Corporation, and Atlantic Coast Line Railroad, a Virginia corporation, Appellees.
Supreme Court of Florida.
June 17, 1959.
Rehearing Denied July 8, 1959.
*172 Howard P. Rives of McMullen, Rives & Baskin, Clearwater, for appellants.
Erle B. Askew, Carroll R. Runyon and S.E. Simmons, St. Petersburg, for City of St. Petersburg.
Mann, Harrison & Mann, St. Petersburg, for Atlantic Coast Line Railroad, appellees.
ROBERTS, Justice.
This is an appeal from a final decree upholding the validity of a "Relocation and Exchange of Property Agreement" entered into between the appellees, the City of St. Petersburg and the Atlantic Coast Line Railroad, as against an attack, inter alia, that it violated § 10 of Article 9 of the Florida Constitution, F.S.A. Jurisdiction of the appeal is taken under Florida Appellate Rule 2.1, subd. a(5), 31 F.S.A., authorizing direct appeals to this court from final judgments or decrees "construing a controlling provision of the Florida or Federal Constitution."
The agreement attacked by the plaintiffs-appellants, as property owners and taxpayers of the City of St. Petersburg, was negotiated by the appellees following years of litigation initiated by the City for the purpose of compelling the railroad to relocate its passenger and freight depots, located in what is now the heart of the City, to a more appropriate place. The City was eventually successful in obtaining such an order from the Florida Railroad and Public Utilities Commission and in combatting efforts on the part of the railroad to have such order set aside in the courts and reconsidered by the Commission. Pending a hearing to determine the site of the new depots, the railroad proposed that the parties negotiate a settlement of the long and expensive controversy, and the City agreed to attempt to do so.
As background for the negotiations, counsel for the appellees point out in their excellent and exhaustive brief filed here that the City was faced not only with the urgent necessity of obtaining relocation of the railroad's depots in order to relieve traffic congestion in the heart of the business district but also with the need to acquire the downtown railroad property as a means of opening up streets now closed thereby in order to relieve traffic congestion on parallel streets and avenues, and with the scarcity of off-street parking. On its part the railroad was faced with the problems of the selection of a new site for its depots and the disposition of its existing downtown properties. Both parties were anxious to terminate the long drawn out litigation. With these considerations in mind and after six months of negotiation the parties finally agreed upon a comprehensive over-all plan designed to achieve the objectives of the parties  the "Relocation and Exchange of Property Agreement" here in question.
In substance, the agreement provides for the conveyance to the City by the railroad *173 of certain of its downtown property, including the sites of the old depots, in exchange for land to be acquired by the City, by purchase or condemnation, as the new site therefor, and the construction thereon by the City of new depots according to plans and specifications to be provided by the railroad. To insure equality in the exchange the railroad property to be conveyed to the City was accurately and competently appraised in advance and its fair market value established at $1,200,000. The maximum obligation of the City under the contract for land acquisition and construction cost is set at the same amount  $1,200,000. In the event the land and construction cost is less than this amount, the City must make up the difference in land or money; if the over-all cost to the City exceeds this amount, the railroad must make a similar adjustment. Other covenants of the parties relate to matters incidentally involved in the conveyance of the exchanged properties and in the adaptation of the new site to railroad terminal purposes.
In holding that the agreement did not violate § 10 of Article 9 of our constitution  forbidding any city "to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual"  the able Chancellor noted that the value of $1,200,000 placed upon the railroad properties to be surrendered by the railroad "is not arbitrarily or capriciously fixed, but is based upon a competent appraisal of their reasonable market value" and said:
"Inasmuch as the City's commitment under the agreement calls for a total expenditure of a like amount, $1,200,000, it is clear that the City is actually exchanging properties on a dollar for dollar basis of value. The fact that the City has agreed to construct certain facilities rather than pay the railroad a stipulated amount for the properties surrendered, in the opinion of this Court, is immaterial. The question, therefore, `Has the City contributed money or pledged its credit to the Railroad?', must be answered in the negative. The clear import of the constitutional mandate is to prevent a city from becoming a joint owner in a private enterprise, and likewise to prevent a city from gratuitously aiding a private corporation, firm or individual at the expense of the City's taxpayers.
"In the opinion of this Court, to hold that two corporate entities, one, a municipality, and the other a public utility, each possessing the power of eminent domain, could not lawfully contract for the reciprocal exchange of properties on a dollar for dollar value basis would do violence to the clear intent of the above constitutional provision."
It is here contended on behalf of appellants that the Chancellor erroneously construed § 10 of Article 9, supra, as prohibiting only gratuitous aid to a private corporation by a municipality, and that the proper construction of the constitutional inhibition is that it also prohibits a municipality from lending its faith and credit "for a purpose contrary to and foreign to normal municipal purposes"; and it is urged that "By no stretch of the imagination here could the construction and erection of this railroad station be deemed a municipal purpose." Brumby v. City of Clearwater, 1933, 108 Fla. 633, 149 So. 203, is relied upon as authority for this contention. The appellants profess to see no distinction between the construction obligation and expenditure by the City involved in Brumby and the one involved in the instant case. We think there is a clear distinction between the two contracts, for the reasons hereafter stated.
We wish to make clear, however, that insofar as the decree here reviewed may be interpreted as holding that § 10 of Article 9 applies only to purely private corporations, as distinguished from corporations performing a public service, such as railroad companies, such interpretation must be disapproved. In a case decided soon after the adoption on May 4, 1875, of the *174 amendment with which we are here concerned (Article VIII, amending § 7 of Article XII of the Constitution of 1868, readopted as § 10 of Article 9 of the Constitution of 1885) it was held that "[t]he prohibition extends as well to a public corporation of this character [railroad corporation] as to a private one." Holland v. State, 1876, 15 Fla. 455, 535. And no subsequent decision has been cited, and none has been found, in which this court sustained a purely gratuitous conveyance of property or lending of credit to a so-called quasi-public corporation. Cf. Tampa Northern R. Co. v. City of Tampa, 104 Fla. 481, 140 So. 311, 141 So. 298; City of St. Petersburg v. Atlantic Coast Line R. Co., 5 Cir., 132 F.2d 675; Bailey v. City of Tampa, 92 Fla. 1030, 111 So. 119.
But we find nothing in the contract here involved that amounts to a gratuitous aiding of the appellee railroad corporation, either by an appropriation of money or property or the lending of its credit to the corporation by the City. As noted above, the transaction amounts to an equal exchange of properties between the City and the railroad, both having the power of eminent domain; and it is well settled in courts of other jurisdictions that where, in furtherance of a public purpose, a body politic is authorized to condemn land, it may condemn other property and exchange it for that needed to accomplish such purpose. This doctrine, known as "compensation by substitution," has been applied in highway re-routing, Darwin v. Town of Cookeville, 1936, 170 Tenn. 508, 97 S.W.2d 838; in railroad relocation, Austin v. Shaw, 1952, 235 N.C. 722, 71 S.E.2d 25, and, even, in relocating an entire town, Brown v. United States, 1923, 263 U.S. 78, 44 S.Ct. 92, 68 L.Ed. 171. See also Langenau Mfg. Co. v. City of Cleveland, 1953, 159 Ohio St. 525, 112 N.E.2d 658; Fitzsimmons & Galvin v. Rogers, 1928, 243 Mich. 649, 220 N.W. 881; Smouse v. Kansas City Southern Ry. Co., 1929, 129 Kan. 176, 282 P. 183; Dohany v. Rogers, D.C.Mich. 1929, 33 F.2d 918; Feltz v. Central Nebraska Public Power & Irr. Dist., 8 Cir., 1942, 124 F.2d 578; Pitznogle v. Western Maryland Ry. Co., 1913, 119 Md. 673, 87 A. 917, 46 L.R.A.,N.S., 319; Chitwood v. City and County of Denver, 1948, 119 Colo. 165, 201 P.2d 605; Carter v. City of Greenville, 175 S.C. 130, 178 S.E. 508. Cf. Riviere v. Orlando Parking Commission, Fla. 1954, 74 So.2d 694.
The fact that, as a part of the consideration for the exchange agreement, the City agreed to construct the railroad facilities at the new site is not fatal to the validity of the agreement, as here contended by the appellants. In Brumby v. City of Clearwater, 149 So. 203, supra, relied upon by appellants in support of their contention, the agreement involved was a mere loan of public money to finance a private business enterprise for the use and benefit of an individual. The contract involved in State v. Town of North Miami, Fla. 1952, 59 So.2d 779, also relied upon, had little more in the way of the public purpose sought to be achieved and much less in the return on the City's investment than that in Brumby, to recommend it. Under the contract involved in the instant case, the City receives land worth the exact amount of its outlay for other property and construction costs, plus freedom from the nuisance of railroad operations in downtown St. Petersburg, plus new and enlarged streets, plus additional space for off-street parking, plus the termination of long and vexatious litigation. The covenant on the part of the City to construct the new railroad facilities was merely incidental to the comprehensive over-all plan agreed upon by the parties as the most practicable and feasible method of accomplishing the municipal purposes which were the primary and paramount objects of the contract. As noted, the cash outlay to be made by the City is exactly the same, whether paid directly to the railroad or indirectly, by construction of the new facilities, as "compensation by substitution."
Accordingly, we conclude as did the court in Fitzsimmons & Galvin v. Rogers, 220 N.W. 881, 887, supra, and paraphrasing its language, that the agreement did not amount *175 to the extension of credit to the railroad but "instead it is the consummation of a contract by and between the parties whereby the [City] will secure the land necessary for [its municipal purposes] and the surrender of the railroad's special charter. The consideration for this is the undertaking and agreement on the part of the [City] as set forth in the contract. The good faith of the undertaking is in no way assailed. It has to do with the legitimate administration of [municipal] affairs, and neither it nor the act in which it is embodied is subject to the objection that it is an attempt on the part of the [City] to grant the use of its credit to the railroad company." See also Austin v. Shaw, 71 S.E.2d 25, supra; and cf. Dudley v. City of Charlotte, 1943, 223 N.C. 638, 27 S.E.2d 732.
Nor can we sustain the appellants' contention that the contract should be nullified because the City's covenants as to zoning amount to "a bartering of police power contrary to fundamental laws of municipal corporations." Obviously, the City cannot by this contract bind any future council in respect to the exercise of the police power or bargain away this prerogative of government. But we see no reason to vitiate the contract because of the covenants of the City, made therein, to do what would necessarily be its duty, with or without such covenants, in order to effectuate the comprehensive over-all plan agreed upon between the parties to accomplish the municipal purposes to be achieved thereby. Cf. City of Gainesville v. Board of Control, Fla. 1955, 81 So.2d 514.
The other attacks on the contract made by appellants have been carefully considered; we find them insufficient to vitiate the agreement in question.
Accordingly, the decree appealed from should be affirmed, except insofar as it may be interpreted as holding that a quasi-public corporation, such as a railroad, is not within the intendment of § 10 of Article 9 of our constitution. With this modification, the decree should be and it is hereby
Affirmed.
TERRELL, C.J., and HOBSON, DREW and THORNAL, JJ., concur.