## In re NEW YORK, N. H. & H. R. CO.
### No. 16562.

District Court, D. Connecticut.
July 18, 1938.

Swan, Keeney & Smith, Eugene J. Phillips, and Nathaniel W. Smith, all of Providence, R. I., for Treasurer of State of Connecticut.

Davies, Auerbach & Cornell, of New York City, and Marsh, Stoddard & Day, of Bridgeport, Conn., for Irving Trust Co.

Fred N. Oliver and Willard P. Scott, both of New York City, for Mutual Sav. Bank Group Committee.

Miller, Owen, Otis & Bailly, Edward C. Bailly, and Edward M. Boyne, all of New York City, for New York Life Ins. Co.

White & Case, and Fitzhugh McGrew, all of New York City, and Wiggin & Dana, Frederick H. Wiggin, and Stewart H. Jones, all of New Haven, Conn., for Bankers Trust Co.

HINCKS, District Judge.

This controversy relates to five parcels of land in the vicinity of Cedar Hill classification yards located near what was originally the westerly terminus of the New Haven, Middletown and Willimantic ("Middletown") Railroad Company. For present purposes, these parcels may be designated as parcels 1, 2, 3, etc., in order from west to east.

In 1867 the Middletown was incorporated to construct and operate a railroad from New Haven through Middletown to Willimantic. In 1870 it acquired parcels 1, 2 and 3. In 1875, the Boston and New York Air Line ("Air Line") was incorporated and succeeded to the property and franchises of the Middletown. Parcel 4 was acquired in part by the Middletown in 1869 and the remainder by the Air Line in 1877 and 1879. Parcel 5 was part of the original location of the Air Line.

In 1882, the Air Line for a term of 99 years leased to the New York, New Haven and Hartford Railroad Company ("New Haven") "all and singular the railroad of the party of the first part, from a point in the city and county of New Haven, to a point in the village of Willimantic, * * * as the said railroad is now and as it may hereafter be located and constructed, and all the lands that may hereafter be included in the location of said railroad, within the terminal points aforesaid; * * * ". The lease also provided: "all new property, improvements and renewals to become part of the demised premises, and as such to be delivered up to the lessor at the expiration of this lease, whether occurring before or at the end of said term." Under this lease the New Haven entered into the possession of the five parcels above mentioned and has continued to possess the same to the present time.

In 1905, while the New Haven was operating the Air Line property as lessee, a mortgage thereon was issued by Air Line at the request of the New Haven to the Treasurer of the State of Connecticut, as trustee, under which bonds in the amount of $3,775,000 were outstanding in the hands of the public upon the institution of these proceedings on October 23, 1935. This mortgage by its granting clause purported to convey: "All and singular the railroad now belonging to said Air Line Company beginning at its junction with the tracks of the New Haven Company in the Town of New Haven and State of Connecticut, and extending easterly to the City of Willimantic in the Town of Windham and State of Connecticut, together with the real estate, railway, rails, bridges, piers, fences, privileges, rights and franchises now owned and hereafter to be acquired by the said Air Line Company and appertaining or belonging to said line of railroad as hereinbefore described, and all lands now or hereafter used and occupied for railroad depots or stations."

In 1907, the Air Line conveyed all its property to the New Haven and became merged therewith.

In 1920, the New Haven issued its so-called first and refunding mortgage to Bankers Trust Company ("Bankers"), as

trustee, which included a vast amount of its property.

The trustee under the Air Line mortgage has brought this petition asking the court to adjudge that the Air Line mortgage constitutes a first lien upon the five parcels referred to above, and in its contentions is joined by New York Life Insurance Company which holds a large block of bonds under that mortgage. The prayer of the petition is resisted by Bankers which contends that the first and refunding mortgage constitutes a first lien upon the five parcels. The controversy is accentuated by the fact that beginning in 1917 the New Haven entered upon the construction of its new Cedar Hill Classification Yard covering parcel 4 and part of parcel 5. A vast amount of capital was invested in this development and its accomplishment affected the use made of the other parcels in question.

### Parcels 1, 2 and 3.

These parcels lay westerly of the Air Line "junction with the tracks of the New Haven Company in the Town of New Haven", quoting from the first part of the granting clause of the Air Line mortgage. These parcels, therefore, were not included within the first part of that clause. But the second part of said granting clause reads: "together with the real estate * * * now owned and * * * appertaining or belonging to said line of railroad" which is described as running easterly from the New Haven-Air Line junction. Bankers contends that parcels 1, 2 and 3, which lay westerly of the junction point and lacked physical contiguity with the line of railroad running easterly therefrom, may not properly be held to be "appertaining or belonging" thereto.

■ If there be any question as to whether these three parcels were intended to be included in the grant of the Air Line mortgage, the first place to look for the answer is the mortgage deed itself. Following this process, we find a recital preliminary to the granting clause, plainly intended to explain the occasion for the mortgage, stating that the "Air Line Company has been legally requested to make, execute and deliver its mortgage or deed of trust to the Treasurer of the State of Connecticut, *of all of its property and franchises.*" This was unequivocal indication of an intent that these parcels, though physically unconnected with Air Line rails, should none the less be deemed to be "appertaining or be-longing to said line of railroad." With the intent so plainly expressed in the deed itself, there is no need and perhaps no propriety in looking elsewhere for the intent.

■ However, an examination of the circumstances surrounding the execution of the mortgage leads to no different conclusion as to the intent. For we find that the Air Line directors and stockholders approved the mortgage indenture including its recital of a request for the issue of a mortgage upon *all* the Air Line property. And a listing statement filed by the New Haven with the New York Stock Exchange, adopted under date of February 13, 1908, stated that the Air Line bonds were secured by mortgage "upon all the property and franchises of the Boston and New York Air Line Railroad Company, including all real estate, rights and franchises." (Bankers objected to the introduction in evidence of this stock exchange listing statement. Ruling was reserved. Now after consideration, the objection is overruled, with exception to Bankers.)

■ If there were evidence that the Air Line had substantial real estate holdings not at all pertaining to its railroad which it had withheld from the property leased and which it was still holding when the Air Line mortgage was executed, it could perhaps have been more plausibly argued that the parcels in question should not be classified with real estate "appertaining" to the line of railroad, and that the recital in the mortgage indenture of request covering *all* the Air Line property was an inadvertence essentially repugnant to the granting clause. For clearly the New Haven treated its lease of 1882 as giving it possession of these parcels. And it is difficult to conceive of any satisfactory explanation for an intent on the part of Air Line, not to mention the New Haven, to withhold from the mortgage parcels which had been included in the lease. However that may be, the record shows that the parcels in question were acquired before the lease to the New Haven in an effort to extend the railroad of the Middletown westerly to tide water. In 1905 when the mortgage was executed, even though the Air Line was then being operated under lease to the New Haven, there was still a possibility that upon the termination of the lease, whether upon its expiration or sooner, the availability of a tide-water connection might become a matter of importance to the Air Line. And in the light of this

396

possibility, a description of these parcels as appertaining to the line of railroad was not inept and no repugnance between the recital and the granting clause thereby resulted.

Thus the evidence, extrinsic as well as intrinsic, requires the conclusion that parcels 1, 2 and 3 were intended to be included in the Air Line mortgage and that this mortgage constitutes a first lien thereon.

Parcel 4.

With respect to this parcel, Bankers claims that although originally this land was actually used as a terminal facility for Air Line operation, some time after the lease to the New Haven all facilities for the separate service of Air Line were removed therefrom and by 1905 the land was used by the New Haven only for its general system purposes. On this basis it is urged that this parcel also did not constitute real estate "appertaining or belonging" to the Air Line railroad.

As to this I find that although all original Air Line structures had been removed from this parcel before 1893, in 1894 the New Haven began the construction of the old Cedar Hill Freight Yard and constructed ladder tracks across this parcel which were thereafter, and up to the date of the Air Line mortgage, used to take cars from and to feed cars to the Air Line as an incident to system operation. However, the arrangement of the tracks was such that the only point of junction between the ladder tracks upon Parcel 4 and the Air Line main tracks was upon other land of the New Haven. But despite this arrangement of the tracks, parcel 4 was physically contiguous to the right of way upon which the Air Line main tracks were then located.

The reasons stated for my holding relating to Parcels 1, 2 and 3 have at least equal and possibly greater applicability with respect to Parcel 4, and the same conclusion is required here. To be sure, even in 1905 Parcel 4 was being utilized by and hence presumably had value to, many segments of the system besides the Air Line. But that fact scarcely betokens an intent to exclude the parcel from the mortgage. It is equally consistent with the existence in 1905 of a confident expectation on the part of the New Haven that the resources of the system would be adequate for a timely discharge of the mortgage. In any event, the language of the mortgage inden-

ture supplemented by the subsequent admission of the New Haven, Bankers' predecessor in title, as contained in the 1908 statement for listing on the Stock Exchange, completely negative the inference which Bankers urges upon me in this connection. Moreover, a termination of the Air Line lease and a repossession of the property was still a possibility in 1905. In that event, certainly, Parcel 4 would have become indispensable to Air Line operation and hence "appertaining" to its line of railroad.

Parcel 5.

This parcel is the original Air Line location for its main tracks extending easterly from Quinnipiac River to Montowese Avenue and beyond. Beginning in 1917 the New Haven with the approval of the Connecticut Public Utilities Commission undertook the construction of the new Cedar Hill Classification Yards and, as an incident to this project in order to make room for the facilities deemed desirable, relocated the main line tracks of the Air Line, putting them a slight distance southerly of their original location all the way from Quinnipiac River easterly to a point a slight distance west of Montowese Avenue. No notice was given of the relocation to the Air Line mortgage trustee nor did the New Haven ever invoke in this connection the release clause of the mortgage which provided as follows: "Said Air Line Company, provided it shall not be at such times in default in the payment of the principal or interest of said bonds, may from time to time, sell or dispose of any lands, right of way, or real or leasehold estate, with the buildings thereon, theretofore acquired and used, or intended to be used, by the Air Line Company for or in connection with its said railroad, if in the opinion of the Board of Directors of said Air Line Company the same shall not be any longer required for the purposes of said railroad. Said Trustee shall not be bound to ascertain or inquire whether such property is any longer required for the said purposes, or whether such sale is expedient; the purchase money of said property so sold or disposed of shall be received by said Trustee, and, if the said property so sold or disposed of shall be replaced by any other property of like character, the purchase money so received shall be applicable to the purchase of such other property, and shall be paid by said Trustee to said Air Line Company, upon delivery to said Trustee of a copy of a resolution of the Board of Di-

rectors of the Air Line Company that it is required for and shall be applied to that purpose, and such property so purchased or substituted shall be vested in the Trustee upon the trusts herein declared concerning the property so sold or disposed of; the said purchase money, until such application thereof, shall remain in the hands of said Trustee."

Now to restore the Air Line tracks to their original location would require a capital expenditure of about $308,000 and would decrease the capacity of the classification yard by 666 cars.

Upon these facts Bankers contends, not that parcel 5 was not intended to be included in the Air Line mortgage, but rather that the court should decree that the First and Refunding mortgage has a lien upon parcel 5 paramount to that of the Air Line mortgage in the amount of the value of the improvements made upon parcel 5, or that the new right of way be substituted for the old, so that the Air Line should have a first lien upon the new location, and Bankers a first lien upon the old location. I will consider first Bankers contention of an equitable substitution.

The Air Line mortgage conveyed "all and singular the railroad" between New Haven and Willimantic. That provision, if it stood alone, I should construe as intended to create a lien upon the tracks which would follow the tracks into a new location whether or not authorized by the public regulatory authorities. Such a provision, standing alone, would indicate an intent that with a change in location the lien would shift,—not accumulate.

■ But here the granting clause goes further and includes "the real estate * * * now owned * * * and appertaining * * * to said line of railroad." This provision created a lien upon parcel 5 just as effectively as a description of the parcel by metes and bounds. And there is nothing in this provision to suggest that the lien thereby created was a roving lien, subject to shift with the tracks. And the provision is expanded to include also "real estate * * * hereafter to be acquired by the said line of railroad." This expansion of the grant was plainly intended and effective to impose a lien upon real estate acquired for a new location of the tracks.

The two provisions of the grant above discussed are connected by the word "together". Construing them together I find them to express an intent that the lien created should include existing real estate owned and used for roadway purposes and also real estate thereafter acquired for such purposes, whether or not in substitution of the original roadway.

I hold therefore that the lien originally attached to parcel 5 and did not shift when or because a new location was thereafter acquired. The same conclusion would have been required if there had been no merger of the Air Line with the New Haven and the land comprised in the new location had been acquired by the Air Line Company by formal deed.

The only provision in the mortgage indenture for a substitution of property under the lien is that contained in the second stated condition following the habendum, which may be referred to as the "release clause". But that is inapplicable here.

■ If the Air Line mortgage had been so drawn that one piece of property might be substituted for another irrespective of their comparative values, the door would have been wide open for a dilution of the mortgage security. To guard against this possibility the indenture provided for substitutions only in the event of *sales* and on the basis of *sale* prices. To be sure, the trustee was exempted from responsibility for ascertaining the bona fides of the sales prices. Nevertheless under fundamental principles he could not be compelled to release any mortgaged parcel or to apply the proceeds to the purchase price of substituted property without a showing that the prices were fair and adequate.

■ Some twenty years have now elapsed since the change in location was accomplished. Until the bringing of this petition there has been no attempt by the mortgagor, or by others, to invoke the method of substitution by sale which was the only method of substitution provided for in the indenture. There is no pretense that the original location was ever sold; nor that the substituted location was ever legally "vested in the trustee upon the trusts herein declared." The mortgaged line has been left to operate on land available only by sufferance.

It is now too late to invoke the method of substitution by sale. From a practical standpoint this is so because with the improvements now existing upon the original location it is physically impossible to sell the location without the improvements. It is so from a legal standpoint because the release clause by its express terms is avail-

able only when there is no default in the payment of the principal or interest on the mortgage bonds.

■ But Bankers contends that it should be treated as a mortgagee in possession who has made improvements "in the honest, though mistaken, belief that he was the absolute owner, with an unincumbered title", under the doctrine of Ensign v. Batterson, 68 Conn. 298, 36 A. 51, 53. Under the doctrine of this case, a junior incumbrancer was allowed to redeem only upon paying not only the prior mortgage debt but also the value of the improvements made by the first mortgagee while in possession in an honest, but mistaken, belief that he was the absolute owner. But certainly that doctrine has no application here for Bankers is here seeking compensation or credit for improvements not from a junior incumbrancer but from the Air Line trustee whose lien is senior to Bankers. Nothing in the Ensign case suggests that even a mortgagee who had made improvements while in possession could compel a senior mortgagee to pay for the improvements.

■ In another aspect, the facts here do not permit of an application of the Ensign doctrine. When the Air Line mortgage was executed, the New Haven was in possession as the mortgagor's lessee. Thereafter upon the merger of the Air Line with the New Haven, the equity of redemption vested in the New Haven which continued in possession while the improvements were made. The fact that the first and refunding mortgage was executed some time after the improvements were accomplished and that temporary loans made to pay for the improvements were subsequently discharged by the proceeds of the first and refunding mortgage do not alter the fact of possession by the New Haven while the improvements were made. There are no equities involved in such a situation which operate to deprive the first mortgagee of the security of improvements made by the owner upon the premises subject to the first mortgage lien. The release clause in the Air Line mortgage did not purport to suspend or nullify the recording acts of the State, nor can it have such an effect. And even though Bankers when it entered into the mortgage indenture securing the first and refunding mortgage and at all times thereafter acted in the honest, but mistaken, belief that it was acquiring and had acquired thereby a first lien upon parcel 5, its assumption that parcel 5 had been released from the Air Line lien under the release clause of that mortgage without a statutory recordation of a *sale* of parcel 5 and a *purchase* of a substituted parcel, could not serve to obliterate its constructive notice of the prior lien.

I hold, therefore, that the petitioner has a first lien upon the five parcels in question, and an order accordingly may be settled by agreement or on notice. The order will embody the bare holding just stated.

■ The broader relief sought by the petitioner is not warranted. The court is without power to tell the debtor or any other party what it shall put in a proposed plan; it can only pass upon such plans as are certified to it by the Commission.

■ Whether the "improvements" made upon these parcels enhanced their value to the Air Line bondholders and if so the weight which in the consideration of any plan should be accorded to that element of value, are questions which probably will not arise until the court comes to consider the treatment of Air Line bonds under some plan. Nor does the record herein suffice to warrant a present order directing payments of interest on Air Line bonds.

And if the trustees shall predicate their action or recommendations with respect to such payments upon an allocation of earnings under the segregation method, it will be time enough then to consider whether their application of the segregation method fairly reflects the holding of this decision.