## In re CENTRAL OF GEORGIA RY. CO.

### No. 4829.

District Court, S. D. Georgia,
Savannah Division.

May 23, 1944.

See also 48 F.Supp. 445.

T. M. Cunningham, of Savannah, Ga., for trustee.

Alexander & Green, of New York City, and McLaws, Brennan & Zeigler, of Savannah, Ga., for Bankers Trust Co., trustee of Consolidated Mortgage of Central of Georgia Ry. Co.

Carter, Ledyard & Milburn, of New York City, and Oliver, Oliver & Davis, of Savannah, Ga., for Manufacturers Trust Co., successor trustee under First Preference Income Mortgage.

Rathbone, Perry, Kelley & Drye, of New York City, and Anderson, Cann & Dunn, of Savannah, Ga., for Central Hanover Bank & Trust Co, successor trustee under Second Preference Income Mortgage.

Hitch, Morris & Harrison, of Savannah, Ga., for Liberty National Bank & Trust Co. of Savannah, trustee of Third Preference Income Mortgage.

Adams, Douglas & Brennan, of Savannah, Ga., for Citizens & Southern Nat. Bank, substitute trustee under Middle Georgia and Atlantic Division Mortgage.

Abrahams, Bouhan, Atkinson & Lawrence, of Savannah, Ga., for certain bondholders of Middle Georgia and Atlantic Division Mortgage, amici curiae.

Lansing B. Lee, of Augusta, Ga., and Robert M. Becket, of New York City, for Chem-

ical Bank & Trust Co., trustee of Debtor's Refunding and General Mortgage.

James L. Homire, of New York City, and Emmet McCaffery, of Washington, D. C., for Reconstruction Finance Corporation.

LOVETT, District Judge.

This is a proceeding instituted by Merrel P. Callaway, Trustee of the property of the Central of Georgia Railway Company, Debtor, for the adjudication of the relative rank and priority of the Consolidated Mortgage, the First, Second, and Third Preference Income Mortgages and the Refunding and General Mortgage of the Debtor on certain railroads, branch lines and leases.[1] The several trustees under these mortgages being in disagreement, adjudication is requested at this time to permit proper allocation of securities in a plan of reorganization which by direction of the Court has been prepared by the Trustee of the Debtor, submitted to the Court and to the Interstate Commerce Commission, and on which hearings are soon to begin.

Evidence has been heard and Briefs of Counsel for interested parties submitted and considered.

As of November 1, 1895, and as a part of the reorganization of Central Railroad & Banking Company, in equity receivership, the Central of Georgia Railway Company, its successor, executed its Consolidated Mortgage to secure an issue of $18,-500,000 of bonds. At the same time it executed its First Preference Income Mortgage, Second Preference Income Mortgage and Third Preference Income Mortgage, identical in terms but of successive priorities. The amount of Income Bonds secured was $15,000,000. Only $269,000, however, are now outstanding. All four Mortgages cover the same property, and each of the Preference Income Mortgages specifically states that it is subject to the prior lien of the Consolidated Mortgage.

These were closed Mortgages, and the proceeds were used chiefly to acquire the properties of the re-organized railway—some small portions were used for equipment and Additions and Betterments. All four Mortgages also contain the usual clause covering property thereafter to be acquired "for use upon or in connection with or for the purposes of" the lines of railway covered by the Mortgages.

In addition, each also contains a further after-acquired property clause:

"Also all the right, title, estate, interest, property and franchises of the Railway Company * * * to any and all lines of railway * * * hereafter acquired * * * or in which it shall * * * hold any interest, subject nevertheless to all conditions upon which any such property or interest shall be acquired, and to *all provisions of this Indenture concerning property hereafter acquired* * * * subject also to the obligations, if any, secured by any pledge or mortgage of such property subject to which it may be acquired * * *." (Italics mine.)

It will be noticed that the after-acquired property clause last quoted refers to "other provisions" of the Indentures concerning after-acquired property, and provides that the lien on after-acquired property shall be subject to such other provisions. The other provisions of the Consolidated Mortgage referred to are found in Sections Sixth and Seventh of Article Two of that Mortgage.

"Sixth * * * all lines of railway and property of every kind * * * when * * * hereafter acquired * * * *from bonds or the proceeds of bonds secured by this Indenture,* shall * * * immediately * * * become and be subject to the lien of this Indenture * * *."

"Seventh * * * upon demand of the Trustee, * * * (the railway) will grant * * * unto the Trustee all real and personal estate * * * which * * * it

---

[1] The lines in question are those running (1) from Milledgeville, Ga., to Covington, Ga., which line is known as the Middle Georgia & Atlantic Division; (2) from Chattanooga, Tenn., to Carrollton, Ga., with a branch line connecting with the Chattanooga line at Chickamauga, Ga., and running to Durham, Ga., which branch is known as the Durham Branch, and all of which line is known as the Chattanooga Division; (3) from Dover, Ga., to Metter, Ga., which line is known as the Oconee Division; (4) from the Henry Ellen Spur at M. P. 1.67 in Alabama to Margaret, Ala., with a branch spur to the Mammoth Mine, all of which is known as the Upper Cahaba Branch Line; (5) from Greenville, Ga., to Raymond, Ga.; and (6) from Covington, Ga., to Porterdale, Ga. The seventh item consists of the leases of the Chattahoochee & Gulf Railroad Company. For convenience all seven will be referred to as seven lines of railway.

shall acquire *as appurtenant to * * * or for the business of,* any railroad hereby mortgaged * * * and it shall and will also deliver * * * all and every further * * * deeds * * * and assurances in law, for the better assuring * * * unto the Trustee all and singular the * * * property hereby conveyed." (Italics mine.)

Following the paragraph last quoted is a "reservation and subordination" clause of the nature sometimes found in railroad mortgages and the presence of which in the Consolidated Mortgage raises the first of the questions here presented. That clause reads:

"* * * nothing expressed or implied in this Indenture is intended, nor shall it be construed, to limit the right or power of the Railway Company, hereinbefore reserved * * * to construct or acquire, either free from or subject to encumbrance, other lines of railway * * * and to assume or *create liens * * * on all railroads hereafter acquired * * * superior and prior to the lien hereof."* (Italics mine.)

The Preference Income Mortgages contain no such provision.

It will be seen from the foregoing statement, that the only vehicle provided for future financing of lines thereafter to be acquired, if first liens thereon became necessary, was through the power reserved by the railway to "create liens on all railroads hereafter acquired * * * superior and prior to" the lien of the Consolidated System Mortgage.

From time to time after November 1, 1895, the Railway Company acquired the seven lines of railway now in dispute, and they became subject to the prior lien of the Consolidated Mortgage and the subordinate liens of the Income Mortgages as they were acquired.[2] The property so acquired was paid for out of earnings or free funds—not from the proceeds of any Consolidated or Income bonds.

On April 1, 1919, the Refunding and General Mortgage, was executed, and, in reliance upon the reservation or subordination clause in the Consolidated Mortgage, the Railway Company expressly created on the seven after-acquired lines a lien which was stated in the mortgage to be superior to that of the Consolidated Mortgage, and prior to that of every other mortgage *except the Preference Income Mortgages* and certain others not here in issue.[3] This mortgage secures $29,110,000 of bonds now outstanding. The proceeds of these bonds were used to refund earlier bonds (some of which were first liens on portions of the lines in controversy), to pay for Additions and Betterments and to purchase equipment. The Reconstruction Finance Corporation holds $10,970,000 of the Refunding Bonds, with other securities, as collateral for a loan of approximately $3,000,000. The proceeds of this loan were used to pay taxes and interest on other bonds and for material and supplies, all being debts with priorities at the time.[4] The balance of the Refunding Bonds are largely held by the public. At the time the Refunding Mortgage was executed the Income Bonds outstanding, through exchange for stock of the railway or otherwise, had been reduced to less than $300,000.

The parties interested under the Consolidated Mortgage claim priority for that mortgage on the grounds that the reservation clause was merely a guard against misinterpretation and that it did not confer on the railroad any additional powers not already reserved. In other words, it is their contention that the debtor had the authority only to acquire property subject to existing liens or to acquire property previously free from lien and to subject it to purchase money liens. Such an interpretation, however, would give no vitality to the language of the reservation clause. It is also contended that the inclusion of the reservation clause in the Consolidated Mortgage and its omission from the Preference Income Mortgages were not intended to create any substantive difference between them and the omission is attributable to some accident of draftsmanship. Therefore, it is said the Income Bonds once being subordinate must always remain so. It is not "so nominated in the bond". The mortgages must be interpreted as they are, not as they might have been.

---

[2] There is no dispute as to the priorities of certain divisional mortgages (first and purchase money liens) on property mentioned in (1), (2), (3) of note 1, and of an underlying mortgage also a prior lien on (2). There is a dispute as to the priority of a divisional mortgage on (6).

[3] See note 2.

[4] A recital of these facts opens up a vista of equitable considerations, which, under other circumstances, it would be interesting to explore. Into that realm I do not enter now because they were not argued by counsel and it seems unnecessary at this time to consider them.

Parties interested under the Refunding and General Mortgage claim priority on the grounds, first, that their mortgage effectually displaced Consolidated's first lien as expressly authorized by Consolidated and, secondly, that authority to subordinate the prior lien of the Consolidated Mortgage necessarily implied authority to subordinate the junior liens of the Preference Mortgages. To hold that the lien of the Preference Income Mortgages is inferior to that of the Refunding and General is to ignore or erase the express recital in the latter mortgage that it is prior to other mortgages mentioned "except the Preference Income Mortgages", and this would do violence to the agreement of the parties. It is not difficult to believe the parties intended to acknowledge the priority of the Income Bonds because, first, the Income bondholders had not agreed to subordinate, and, secondly, the amount of such bonds had been reduced from $15,000,000, originally to less than $300,000 then outstanding, a relatively small sum compared to the $60,000,000 the Refunding Mortgage contemplated might be issued under it. It is argued that to hold against the contention that the Preference Income Bonds have been subordinated under the so-called implied authority is to create an impossible circuity of liens. Thus, the Refunding and General would be prior to the Consolidated, the Preference Income prior to the Refunding and General, and, completing the illogical circle, the Consolidated would be prior to the Preference Income. The actual priorities under these circumstances would become completely indeterminable. The fallacy in that argument is that the Preference Income Mortgages agreed to be inferior to the Consolidated only so long as the Consolidated retained .its existing lien. The Consolidated had agreed that as to after-acquired property its lien might be postponed. When its lien on these lines was postponed by the Refunding and General, it lost its priority as to these lines. As to all other property covered, it is still prior.

The holders under the Preference Income Mortgages claim priority by a mere application of the plain terms of the instruments involved. They say, unlike Consolidated, that they never agreed for their lien to be displaced by any one and that by the terms of the Refunding and General Mortgage their priority is expressly recognized.

Before reaching a final conclusion as to the rank of these liens, it must first be determined whether the Railway Company legally reserved the power to do what is now claimed to have been done, i.e., was the reservation clause valid. Then it must be determined whether the power so reserved has been properly exercised to bring about the result claimed.

The decided cases are of little help.

The most recent case on the subject appears to be Ecker v. Western Pacific Railroad Corporation, 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892 (1943). The Court said:

"It is argued .that this reservation permits the acquisition of rolling stock entirely free from the lien of the First Mortgage, unless acquired, as was not the case here, by the use of proceeds of the first mortgage bonds.

"We do not so view the reservation. It rather performs the function of authorizing the acquisition of equipment by equipment trust or other method and only to that extent displacing the lien of the First Mortgage arising from the after-acquired property clauses." [63 S.Ct. 717.] .

In the mortgage considered in that case, however, it was stated, immediately following the granting clause conveying all property both presently owned and after-acquired, that the property conveyed was:

"Subject, However, * * * to the equipment trust or conditional sale agreements to which the same shall be subject as permitted hereby * */ *."

In explaining their holding, the Court said:

" * * * the 'subject, however' clause clearly contemplates that the First Mortgage shall be a lien on equipment second only to equipment trust agreements. That clause provides for the subordination of the First Mortgage to equipment trust agreements to which after-acquired equipment shall be subject 'as permitted hereby.' These last words, a reference to the reservation clause, confirm our view that the function of the reservation clause is merely to permit the purchase of equipment by that method and not to authorize the completely untrammeled acquisition of such equipment."

That case, however, is not authority for the invalidity of the unrestricted reservation clause in the Consolidated Mortgage.

The only other reported case on the subject is Providence Engineering Corporation v. Downey Shipbuilding Corporation, 2 Cir., 1923, 294 F. 641. That case has been cited to sustain the validity of the reservation clause. It is not sound authority for that position, however, for there the bonds issued under the subsequent mortgage were bought in reliance on representations by the Trustee of the first mortgage that his mortgage would be subordinated to that under which the bonds were sold. He was thereby estopped to deny the validity of the power of subordination.

In the case of Equitable Trust Co. of New York v. Wabash Railroad Co., D. C. (E.D.Mo., 1921, unreported), a reservation clause was held effective to displace the lien of a refunding Mortgage in favor of a subsequent equipment trust. But that goes no further than the Ecker case, supra.

In re Chicago, Rock Island and Pacific Railway Co., D. C. (N.D.Ill., 1939, unreported), the validity of the reservation clause was not disputed. The Court said the railway company was permitted by the clause to acquire other lines of railway and equipment free from the prior lien. The only question was what equipment under the terms of the mortgage could be acquired lien free.

■ There is no rule of law or public policy of which I am aware that forbids a lien-holder from agreeing to subordinate his lien on property thereafter acquired, and I am of the opinion that the Railway Company did legally reserve the right to acquire these lines free from the lien of the Consolidated Mortgage.

Having this right, it appears that the Railway Company did everything in its power to displace the priority of the Consolidated Mortgage so far as the property in question is concerned.

It is pressed hard in argument that to place the Preference Income Mortgages at the top of the pile, first in priority, is to take the most inferior security of 1895 and give it a place of primacy as of 1919, contrary to what it may be assumed the parties in 1895 would have agreed to do; the effect is to say the stone which the builders refused is become the head of the corner. The answer, as it seems to me, is that the architects of the financial structure of the railway nearly fifty years ago designed it that way, and it is not within the competency of this Court now to change their plan. There are many reasons why the parties in 1895 may have wanted it that way. Conceivably, it may have been thought the Income Bonds would not be marketable otherwise. The interest on them was payable only if net income in a given year was sufficient, under a formula set out in the Indenture, to pay the interest. The interest was non-cumulative. Or it may have been thought they would soon be re-financed, as it now appears has been done to most of them.

■ Since the Refunding and General Mortgage expressly stated that it was prior to all liens except the income mortgages, etc., the priority of liens on this property must now be: First, the Preference Income Mortgages; second, the Refunding and General Mortgage; and third, the Consolidated Mortgage.

This brings us to the contention of the trustee of the Purchase Money First Mortgage of the Middle Georgia & Atlantic Division that his mortgage is a prior lien on the Covington-Porterdale line (Item No. 6, note 1) because the after-acquired property clauses of the Consolidated Mortgage were not broad enough to include that line and the like clauses in its mortgages are.

The Covington-Porterdale line was acquired and constructed with the general funds of the Railway Company and not with the proceeds of the sale of any bonds issued under the Middle Georgia and Atlantic Division Mortgage.[5] At the time that line was acquired the Consolidated Mortgage, the Preference Income Mortgages and the Middle Georgia & Atlantic Division Mortgage were all in existence. The Consolidated and the Income Mortgages, executed 1895, were prior in date to the Middle Georgia and Atlantic Mortgage, executed 1897, and each of the earlier mortgages contained the same after-acquired property clauses. If that clause is broad enough to include the Covington-Porterdale line, then the lien of those mortgages attached prior to that of the Middle Georgia & Atlantic Mortgage.

The after-acquired clauses in the Con-

---

[5] This Divisional Mortgage is admittedly a first lien on the line of railway from Milledgeville to Covington, Ga., a distance of 64.44 miles, known as the Middle Georgia and Atlantic Division.

solidated Mortgage included "any and all property, real or personal, of every kind and description, now or hereafter acquired for use upon or in connection with, or for the purposes of, such lines of railway" and also "all lines of railway and branches by it hereafter acquired", etc. That of the Middle Georgia & Atlantic Division Mortgage is more restricted and included " * * * the franchises, rights and privileges now or hereafter appurtenant to, or used in connection with the said Middle Georgia & Atlantic Division * * * including any and all roadbed, superstructure, rights of way, roads, tracks * * * and all other things of whatever kind, now or at any time hereafter belonging or appertaining to such division of railway, or provided for use thereon, or in connection therewith."

The Covington-Porterdale line was an extension or branch line built from Covington, the western terminus of the Middle Georgia & Atlantic Division, four miles southwest to Porterdale. The purpose of the line was to serve a textile mill there and the local hardware, drug and mercantile business and to provide passenger service to the citizens of Porterdale. While in a literal sense it may be called an extension of the line from Milledgeville to Covington, and therefore appurtenant, it is also capable of being physically severed from it and connected with another line of railway, the Georgia Railroad, which extends from Atlanta to Augusta, Ga., via Covington. To that extent, at least, it is unlike an industrial spur track at some intermediate point on the line of railway, which it is claimed would not be covered by the terms used in the earlier after-acquired clauses. It is not the kind of "roadbed, tracks, rights of way" or "franchises, rights and privileges * * * hereafter appurtenant" to the division, as described in the Middle Georgia & Atlantic Divisional Mortgage. It is more nearly a "line of railway or branch" as contemplated by the Consolidated Mortgage. Noscitur a sociis. I, therefore, find the Covington-Porterdale

line is a branch line originally subject to the prior lien of the Consolidated Mortgage and now subject to the prior lien of the Preference Income Mortgage and the subordinate liens of the Refunding and General Mortgage, and the Consolidated Mortgage in that order.

Without suggesting that the action of the trustees of the Consolidated Mortgage could estop the bondholders from making the claims here presented, I cannot fail to notice that both the trustees and the bondholders took no steps to protect their interest after being constructively notified by the recording of the Refunding and General Mortgage that their lien upon the property in question was being displaced. It seems to me they should have promptly challenged, in some manner, the right of the mortgagor to subordinate their lien. Yet, for seventeen years (1919 to 1936) they were supinely silent. They were aware or should have been aware that the public was relying upon the validity of the Refunding Mortgage. This is indicated by the fact that various investors' Manuals (Poor's, Moody's and others) treated the lien of the Consolidated as having been displaced. It was imprudent, to say the least, for the bondholders and trustees to remain silent. They either could have brought a bill to quiet title or, under the further assurance clause of their mortgage, they could have demanded that the debtor convey these properties to the trustees, and, upon the failure of the debtor to do so, they could have brought an action for specific performance. Their inaction is some evidence to my mind, that they were acquiescing in the displacement of their lien or, to put it another way, that they then construed the several clauses in the mortgages as I do now.

And very much the same may be said as to the trustee and bondholders of Middle Georgia & Atlantic. They waited even longer, I believe, to call in question the priority the Refunding and General Mortgage asserted as far back as 1919.