In re CENTRAL OF GEORGIA RY. CO.

No. 4829.

District Court, S. D. Georgia,
Savannah Division.

Jan. 10, 1945.

See also, D.C., 56 F.Supp. 10.

T. M. Cunningham and George O'Donnell, both of Savannah, Ga., for M. P. Callaway, trustee.

Francis T. P. Plimpton (of Debevoise, Stevenson, Plimpton & Page), of New York City, and R. Basil Morris (of Hitch, Morris & Harrison), of Savannah, Ga., for Liberty National Bank & Trust Co. of Savannah, trustee of First Mortgage.

Edward W. Bourne (Alexander & Green), of New York City, for Bankers Trust Co., trustee of Consolidated Mortgage.

Robert M. Becket (Wright, Gordon, Zachary, Parlin & Cahill), of New York City, and W. M. Fulcher (Lee, Congdon & Fulcher), of Augusta, Ga., for Chemical Bank & Trust Co., trustee of Refunding and General Mortgage.

A. M. Lewis (Rathbone, Perry, Kelley & Drye), of New York City, and Henry M. Dunn (Anderson, Cann & Dunn), of Savannah, Ga., for Chemical Bank & Trust Co., trustee of Chattanooga, Rome & Southern R. Co., and trustee of Second Preference Income Mortgage.

F. M. Oliver (Oliver, Oliver & Davis), of Savannah, Ga., for Manufacturers Trust Co., trustee of First Preference Income Mortgage.

LOVETT, District Judge.

The trustee of the debtor has filed a petition asking the court to determine if certain coal-producing lands in Alabama known as the St. Clair County Coal Lands, an asset of the railway, are subject to any of its mortgages; and, if so, that the court state the relative priorities of their liens. A judicial determination is required at this time because the allocation and distribution of new securities under debtor's plan of reorganization, now pending before the Interstate Commerce Commission, can not be finally passed upon by that body until these questions are settled.

The trustees of the several system mortgages securing bonds of the debtor have appeared and, though agreeing the lands are subject to the mortgages, differ among themselves as to the priorities. The trustee of debtor expresses doubt as to the lands being mortgaged at all. The trustee of debtor's First Mortgage, not a system mortgage, argues the language used in the system mortgages is insufficient to include these coal lands, but, if included, all the mortgages, including the First, are jointly applicable in proportion, as the coal lands have supplied the needs of each mortgage division.

Evidence has been heard, the record in the entire proceedings for reorganiza-tion is before the court and briefs submitted have been considered.

In 1905, the debtor purchased certain coal lands in St. Clair County, Ala.,[1] from a subsidiary corporation, and built a branch line near Birmingham about 11½ miles long to connect its tracks with the lands. The purchase and cost of constructing the branch line were financed by the issuance by the debtor of $600,000.00 principal amount of bonds, secured by a first mortgage and deed of trust dated August 1, 1905, under which the branch line of railroad, the coal lands and the mineral rights were mortgaged. When the Refunding and General Mortgage of the debtor, hereinafter more fully discussed, was executed in 1919, $405,000.00 principal amount of these bonds had been retired leaving $195,000.00 outstanding. That mortgage reserved an equivalent amount of bonds to be issued under it to be exchanged for the outstanding older bonds. The $195,000.00 of outstanding bonds was paid off by the debtor from time to time as they became due, and in 1925 $195,000.00 of Refunding bonds were issued to the debtor to reimburse it for the retirement and in turn were sold by the debtor and are now outstanding. The $600,000.00 mortgage thereupon was cancelled.

The coal lands originally cost $250,653.-61. By a contract entered into in 1908, supplemented by an agreement made in 1933, the lands were leased on a royalty basis to the Alabama Fuel & Iron Company. Between January 1933 and August 1944 the royalties paid to the debtor were $314,390.08.[2] Something in excess of eleven million tons of coal have been taken from the lands. The lands were depreciated in the usual manner from year to year on the books of the debtor until now they are carried at zero or a minus figure. Their present value is not shown by the evidence but coal is still being mined and they do have a substantial value.

The petition of debtor's trustee now before me alleges—and it is verified—that the lands were purchased in order to insure an adequate supply of coal for the

---

[1] The original purchase was of 4300 acres in fee, 5120 acres mineral rights and 1899 acres surface rights. On December 31, 1943, through sales and loss of title in litigation, the acreage had been reduced to 9287 acres. The allegation in the petition of trustee's debtor that the lands consisted of 5345 acres is an error.

[2] The income from the royalties was not allocated under the segregation formula used by debtor's trustee, nor have any of the mortgaged lines been given the benefit of it up to this time in the debtor's plan of reorganization.

operation of the lines of railway of the debtor, and the only evidence touching the matter is that the "lands were purchased by the Central to insure an adequate supply of coal at a reasonable price for the operation of the Central's lines" (Fulton, Comptroller). The Comptroller also testified that the railway gets its principal supply of coal from these lands, purchasing it from the lessee which mines the coal, taking it over its own lines to Columbus, Georgia, and there distributing it over the various parts of the system where it is to be used. Under the lease contract the railway has the option of taking two thirds of the entire output of the coal mines. The railway and its wholly owned subsidiary, the Ocean Steamship Company, apparently are the principal customers of the Alabama Fuel & Iron Company, so far as the output of the mines goes, though the evidence has not disclosed just what part of the coal mined is taken by them.[3]

Ten years before the purchase of the coal lands the debtor had executed four system mortgages securing bonds, known for convenience in these proceedings as the Consolidated, and First, Second and Third Preference Income Mortgages. The four mortgages cover the same property and each of the Preference Income Mortgages was made subject to the prior lien of the Consolidated Mortgage. The Income Mortgages were identical in terms but of successive priorities. Each of the four mortgages contained a clause creating a lien upon property thereafter to be acquired "for use upon or in connection with or for the purpose of such lines of railway or any such branch, leased or operated line."[4] The meaning of these clauses creates one of the controversies.

The Consolidated Mortgage also contained what is known as a reservation and subordination clause reading, in abbreviated form as follows:

"* * * Nothing expressed or implied in this Indenture is intended, nor shall it be construed, to limit the right or power of the Railway Company, hereinbefore reserved, to construct or acquire, either free from or subject to encumbrance, other lines of railway * * * and to assume or create liens * * * on all railroads hereafter acquired * * * superior and prior to the lien hereof."

The Income mortgages had no like clauses in them.

The First Mortgage was also executed in 1895. It is really a divisional mortgage, covering the main line of railway from Savannah to Atlanta, Georgia, and part of a branch line, a very important but not the greater part of the system in miles of track, with a second lien on the Steamship Company shares of stock. That mortgage contains an after-acquired property clause also covering "any and all property, real or personal, of every kind and description, now or hereafter acquired for use upon, or in connection with, or for the purpose of using and operating such main line of railway and branch line."

In 1919 another system mortgage was created, to which I have already referred, and which I shall hereafter call the Refunding Mortgage. Among its purposes, as stated, were the refunding of the whole or some part of prior outstanding bonds, the construction of extensions and branches and additions to existing lines of railway and others thereafter acquired, the making of additions and betterments and the construction, purchase or other acquisition of additional lines of railroad, and the expending of funds for other legitimate corporate purposes. In this mortgage we are not concerned with the after-acquired property clause. It is the granting clause that is in controversy. After describing by parcels the lines of railway subject to prior system and divisional mortgages, a lease of another line of railway, certain trackage and terminal rights, it reads, also, abbreviated:

"Also (having reference to all parcels hereinbefore described) all lands * * * coal houses * * * and all other property, real and personal, and rights and things of every kind and description, to the full extent of all interest therein now owned or hereafter acquired by the Railway Company or its successors, which shall in any wise or at any time belong or appertain to, or

---

[3] It is not made clear by the evidence why these coal lands were leased instead of operated by the railway. It may be the Hepburn Act, 34 Stat. 584, 49 U.S.C.A. § 1 (8), prohibiting railroads from carrying coal from captive mines except for their own use had something to do with it, as it seems always to have been contemplated the Ocean Steamship Co., and perhaps others, would take some of the output.

[4] For a fuller description of the four mortgages mentioned see In re Central of Georgia Railway Co., D.C., 56 F.Supp. 10.

be provided for use upon, or for the purposes of, or in connection with, any of said lines of railroad and railroad and terminal properties mentioned or described, or hereafter acquired or constructed and subject to the lien hereof; Provided always that no railroad hereafter constructed * * * or any other property of the Railway Company, if not described herein, or not appurtenant to, or connected with the use or operation of any of the mortgaged property and premises, shall be subject to the lien of this Indenture unless either (a) the same shall be expressly subjected hereto by appropriate conveyance to the Trustee as hereinafter provided, or (b) bonds shall be issued, or deposited cash be paid, hereunder against expenditures made in the construction or acquisition thereof."

The Refunding Mortgage in the granting clause expressly described the branch line of railroad connecting debtor's tracks with the coal lands, but neither it nor any of the other mortgages to be considered expressly described the coal lands or by any identifying or specific words indicated they were made subject to the liens. If covered, it must be because of the general language used in the several mortgages to which reference has been made.

The branch line of railroad connecting with the coal lands, the lease of another railroad and other lines of railroad, all of which were acquired by the debtor after 1895, are described with other property as Parcels 3 and 4 in the Refunding Mortgage. It is recited that they became subject to the Consolidated Mortgage under the after-acquired property clause as and when acquired. But, pursuant to the reservation and subordination clause of that mortgage, it is declared that the Refunding Mortgage "is and shall be a lien superior and prior to the lien of said Consolidated Mortgage," on the railroads and leasehold so described "so that this Indenture shall be a lien on all such railroads, leaseholds and property in all respects superior and prior to the lien of every mortgage thereon except (1) the Income mortgages"; (2) certain divisional and underlying mortgages not here in controversy. That this mortgage effectively displaced the prior lien of the Consolidated (but not of Income mortgages) on these lines of railroad and the leasehold was decided by this court on May 23, 1944, In re Central of Georgia Railway Co., supra (see note 4), and an appeal is now pending in the Circuit Court of Appeals from that decision. The coal lands are not referred to by name or otherwise expressly in the declaration with respect to subordination of Consolidated's prior lien.

The Consolidated Mortgage trustee claims a first lien on the coal lands under the after-acquired property clause in its mortgage.

The trustees under the First and Second Preference Income bonds also claim first and second liens respectively under like clauses in their mortgages, saying that Consolidated's first lien was displaced by the Refunding Mortgage but their liens were not. They rely on the decision of this court of May 23, 1944, supra. The trustee under the Third Preference Income Mortgage has not favored the court with the benefits of its views, but its lien must follow the Second's.

The Refunding Mortgage claims a second lien, inferior only to the Income mortgages, under the reasoning of that part of the decision of May 23, 1944 holding Consolidated's lien had been subordinated to its as to certain railroads and a leasehold there being considered and, I believe, reserves the right to claim a first lien ahead of the Income bonds if on appeal in that case it should be determined Refunding is entitled to priority over them on the property there in issue.

The First Mortgage, as I have already indicated, contends the coal lands are a free asset encumbered by no lien, or, if held subject to any mortgage, they should be held subject to all in proportion, the coal produced having supplied the needs of each mortgage division.

Debtor's trustee, doubtful as to any lien, impartial as to all, brings this bundle of issues and drops them in the court's lap; and then, folding his tent, like the Arabs, silently steals away.

I am of opinion that the lands are mortgaged.

In my view, the after-acquired property clauses in the Consolidated, First, Second and Third Preference Income mortgages, properly construed, are sufficient to include them. The priorities of liens are in that order.

The granting clause in the Refunding Mortgage is also broad enough to create a lien on these lands, inferior, however, to the four earlier mortgages mentioned.

The Refunding Mortgage did not effectively displace or subordinate the lien of the Consolidated Mortgage (nor of the Income mortgages) as the reservation of power to subordinate made in the Consolidated Mortgage was limited to "all railroads hereafter acquired" and does not extend to coal-producing lands of the nature under consideration.

The after-acquired property clause of the First Mortgage, it not being a system mortgage, is insufficient to take in these lands.

And I so hold.

## I.

*The After-Acquired Property Clauses in the Consolidated and Income Mortgages.*

■ The words "any and all property, real or personal * * * hereafter acquired for use upon, in connection with or for the purpose of such lines of railway" of the system, if given their usual and ordinary meaning, are sufficient to include the coal lands, admittedly acquired in order to insure an adequate supply of coal at a reasonable price for the operation of the railroad as a whole, and thereafter, though leased, used principally for that purpose, unless the inclusion of them violates some rule of law or is shown to be contrary to the intention of the parties.

■ While at common law a grant of property to be acquired was void because a person can not grant a thing which he has not, a different rule was established in equity long ago. The equity courts hold the law will permit the conveyance to take effect upon the property when it is brought into existence and belongs to the grantor, in fulfilment of the express agreement, founded on a good and valuable consideration, when no rule of law is infringed or rights of a third party prejudiced.[5] Courts of bankruptcy generally apply these equitable rules.

In Georgia, by a general act for the incorporations of railroads under which debtor was organized, enacted in 1892, Ga.L.1892, pp. 43, 44, Ga.Code (1933) Sec. 94-301(10), they were expressly given corporate power to execute trust deeds or mortgages and to make provision therein for transferring, among other things, "grounds, rights, privileges * * * and appurtenances used in connection with said railroad in any manner, then owned by said company, or which thereafter it may acquire" as security for bonds or other debts. And in 1899, Georgia amended its Code section limiting the property a mortgage may embrace by providing "A mortgage given by a person or corporation to a trustee or trustees, to secure an issue of bonds, shall, when it is expressly so stipulated therein embrace and cover after-acquired property of such person or corporation." Ga.L.1899, p. 32, Ga.Code, Sec. 67-103.

■ If we look to the law of the state wherein the land is situated as controlling the validity and effect of a transfer of an interest (Thompson v. Fairbanks, 196 U.S. 516, 25 S.Ct. 306, 49 L.Ed. 577; 15 C.J.S., Conflict of Laws, § 19c (1)), there appears to be no express statutory authority in Alabama for a railroad to mortgage after-acquired property, but the Supreme Court of that State as far back as 1875 recognized the right independently of any express legislative enactment. In Meyer v. Johnston, 53 Ala. 237, 272, the court said: "The power of a railroad corporation in this country, to mortgage its road * * * with all its present and future appurtenances, and all of its present and future property, real and personal, in any way connected with, or incident to the road * * * and without any statutory aid, ought at this day to be considered as forever settled."

■ It seems plain to me that these coal lands were acquired in 1905 "for use in connection with and for the purposes of" the lines of railway of the system, and that they may be regarded as appurtenant to the system lines in the sense of being an adjunct of or accessory to them, though in the legal sense not appurtenant to the branch line leading to them or to any particular division.

It is argued, however, that the quoted language is ambiguous, and we should look

---

5 Pennock v. Coe, 23 How. 117, 16 L.Ed. 436; Bear Lake & River Waterworks & Irrigation Co. v. Garland, 164 U.S. 1, 17 S.Ct. 7, 41 L.Ed. 327, 36 Am.Jur. (Mortgages) Sec. 33; McTigle v. Macon Const. Co., 94 Ga. 306, 21 S.E. 701, 32 L.R.A. 208, 47 Am.St.Rep. 153; Hawkins v. Mercantile Trust, etc., Co., 96 Ga. 580, 23 S. E. 498. See also Georgia So. & F. Ry. Co. v. Barton, 101 Ga. 466, 28 S.E. 842; Durant v. Duchess D'Auxy, 107 Ga. 456, 33 S.E. 478.

to the intent of the authors of these conveyances. While not adopting in toto the principle that after-acquired property clauses in mortgages must be interpreted and construed strictly in favor of the exemption of after-acquired property therefrom, decisions of courts adhering to this principle are cited and relied upon.[6] It is said the words conceivably may include any property the ownership of which the railway might have considered advantageous, but that the sounder view is the conveyances were intended to cover only such property as was necessary or indispensable to the operation of the railway, such property as would ordinarily be classified as transportation property under standard Interstate Commerce Commission accounting regulations. And coal lands, it is argued, are not indispensable and are not transportation property. I can not agree. It can not be questioned that under some circumstances property acquired simply because it is useful or advantageous to a railroad in the operation of its business may not pass as an "appurtenance" under a mortgage of such railroad. Humphreys v. McKissock, 140 U.S. 304, 11 S.Ct. 1022, 35 L.Ed. 595, in which stock in a grain elevator not located on the line of railway and constructed jointly by several railways was held not to be an appurtenance, is an example. See also White Sulphur Springs case, supra, involving the ownership of a resort hotel. But a railroad must have fuel for its locomotives or it can not run trains. And in 1905 coal was the fuel used exclusively by this railroad. Certainly the coal was indispensable. It may be coal lands were not. The coal possibly might have been bought from others. Nevertheless, if the management of the railway considered it necessary, to supply an adequate amount at a reasonable cost, to buy these coal lands why should this court forty years later be called upon to say the management was wrong? It may be they could not get an adequate supply from any other source. If these lands had been acquired for operation as an independent commercial enterprise out of which the railway expected to derive profits to increase its earnings, the applicability of the after-acquired property clause might be open to doubt. We would then have the question of whether the ownership and operation of such coal lands as an independent enterprise was "in connection with, or for the purpose of" such line of railway. But that is not the case before us.

 The fact that the coal lands were leased to another to operate also seems of no consequence to me; the railway reserving the option to take two thirds of the output of the mines. If the liens once attached, even a sale of the lands would not have divested them. Cf. Hawkins v. Mercantile Trust Co., supra, 96 Ga. at page 583, 23 S.E. at page 498, where the Supreme Court of Georgia, speaking of certain lots of land purchased by a railway for future use, and not adjacent to its tracks, which later being found unusable were sold, said: "At the time the lots were purchased with the company's funds, there was certainly some design or intention to use them 'for or in connection with' the railroad itself; otherwise, they would not have been purchased at all. Nor does it matter that, for amply sufficient reasons, it afterwards transpired that the lots were unsuitable for railroad purposes, and were consequently disposed of by sale. In our judgment, they became subject to the mortgage the moment they were purchased by the railway company."

In the most recent decision of the Supreme Court of the United States dealing with conflicting claims of liens on property acquired between the execution of two mortgages (in that case equipment), it appeared that the after-acquired property clause in the older mortgage recited the property was to be covered if it fell into any one of four categories. The third after-acquired property clause, Subdivision (3), referred to property "used or acquired for use in or for the maintenance or operation of or appertaining to" any of the property subject to the lien of the mortgage. It was stipulated that all the equipment in controversy was acquired for use and was used on all of the debtor's lines. The court held: "This would seem to make clear that the debtor's equity in equipment trust rolling stock is covered by the lien of the First [the older] Mortgage. Subdivision (3) of the third, after acquired property clause * * *." Ecker v. Western Pacific R. Corp., 318 U.S. 448, 491-493, 63 S.Ct. 692, 716, 87 L.Ed. 892.

In Chase Nat. Bk. v. Richmond Cedar Works, 93 F.2d 695, 697, Judge Soper,

---

[6] See United States v. White Sulphur Springs, D.C., 57 F.Supp. 48; In re Kansas City Journal Post Co., 8 Cir., 144 F. 2d 808; Guaranty Trust Co. v. Minneapolis & St. L. R. Co., 8 Cir., 36 F.2d 747.

speaking for the Fourth Circuit Court of Appeals, held that a mortgage lien attached to a planing mill and lumber yard, including land necessary for operation thereof, though acquired after the execution of the mortgage and three quarters of a mile away from the lands described in the mortgage, saying: "We see no escape from the conclusion that the planing mill and new lumber yard fall within the words of the mortgage 'all plants, mills, factories, &c. with their equipment and accessories * * * now or at any time hereafter * * * used * * * in connection with any real property hereinabove described.' Quite clearly the planing mill and lumber yard are described in this list, and it is of no consequence that they were not in existence when the mortgage was executed."

There has been considerable discussion in the briefs filed in this case about the rule of strict construction, and there are expressions in the opinions of many of the courts to the effect that not only must words of futurity be used in after-acquired property clauses in mortgages but the property to be covered must be connected with or essential to the enterprise.[7] I find it unnecessary to choose between a strict or liberal construction, for under either principle the coal lands, in my opinion, were brought within the reach of the clauses. It should be noticed, however, that some of the courts make a distinction between clauses of this kind in mortgages of quasi-public corporations and of ordinary private, commercial corporations, and a distinction also between personal or intangible property and real estate subsequently acquired.[8]

The Ecker case, supra, seems to me to rule this case, and I should follow it. Besides, the conclusion that the liens attached is right.

## II.

### The Granting Clause in the Refunding Mortgage.

■ Having determined that "all property * * * hereafter acquired for use upon or in connection with, or for the purpose of such lines of railway" included these coal lands, it would seem to follow that the more specific language, "all lands * * * now owned by the railway company * * * which shall in any wise or at any time * * * be provided for the purposes of, or in connection with, any of said lines of railroad" should have the same meaning. One was a grant in futuro, the other in praesenti. That seems the only practical difference.

That this somewhat more specific language, though still in general terms, is sufficient to cover the coal lands and subject them to the lien of the Refunding Mortgage[9] is conceded by all of the mortgage trustees except the trustee of the First Mortgage. The argument against inclusion is that in the one case, not being owned by mortgagor, they could not be specifically described, in the other they could, and, therefore, words of such general import, for the purposes of a present grant, should be limited to railroad or transportation property, or to property of the kind ordinarily and necessarily owned by a railway; and that the omission of express reference to coal lands, though then owned, cannot be satisfactorily explained unless they were intended to be excluded. Attention is directed to the fact that when the Refunding Mortgage was executed an earlier mortgage on the coal lands and the branch line of railroad leading to it was outstanding, and, though the branch line is referred to expressly in the Refunding Mortgage and clearly was granted, the coal lands were not.[10]

A more comprehensive and all-inclusive word than "all" can hardly be found in the English language. There is a totality about it that few words possess. It is the whole, the sum of all the parts, the aggregate. Unless there is evidence, extrinsic or intrinsic, to show that the parties intended to give it a lesser meaning it should be construed as covering the entire lands owned by the railway.

■ It is not surprising that the coal lands were not described by metes and bounds or otherwise specifically referred to in this mortgage. No other lands were. It will hardly be contended other lands, e.g., station grounds, etc., are not covered

---

[7] See White Sulphur Springs, Kansas City Journal, Minneapolis & St. L. R. Co. cases, supra; Cleveland Trust Co. v. Consolidated Gas, E. L. & P. Co., 4 Cir., 55 F.2d 211.

[8] Mallory v. Maryland Glass Co., C.C., 131 F. 111; In re Adamant Plaster Co.,

D.C., 137 F. 251, 255; Pintsch Compressing Co. v. Buffalo Gas Co., 2 Cir., 280 F. 830, 835.

[9] Leaving open the question of priorities.

[10] Further reference is made to these facts in part III of this opinion.

by the mortgage. Specific description is not necessary in a mortgage of this kind. In re New York, N. H. & H. R. Co., D. C., 27 F.Supp. 392, 397. They might have been described with particularity ex industria, but if all lands conveyed had been so described, the mortgage would have been extended unduly; and it is long enough as it is. Conceding that "railroad property" and "property of a railroad company" are not synonymous terms (Northern P. R. Co. v. Walker, C. C., 47 F. 681, 685), we do not find those words used in this mortgage, or, at least, those are not the words with which we are now concerned. Nor do cases like Humphreys v. McKissock, supra, help us. There a grain elevator was held not an "appurtenance", where not on the line of railway. The court was not construing comprehensive language like that now under consideration.

I am not impressed by the urge that inclusion of the branch line of railroad by specific reference and failure to mention coal lands by name or particular description evinces an intention to exclude the lands, on the doctrine of expressio unius, etc. One of the cases strongly relied on by the trustee of the First Mortgage, State of Alabama v. Montague, 117 U.S. 602, 610, 6 S.Ct. 911, 914, 29 L.Ed. 1000, calls attention to what I regard as the true rule of construction. In that case the words "all other property" were used in the granting clause in immediate connection with an express reference to a telegraph line and telegraph offices and machine shops in certain states through which the railroad lines ran. In holding this language insufficient to cover a parcel of real estate in Tennessee (other lands being specifically mentioned as mortgaged), the court, after referring to the ejusdem generis rule of construction, said: "It is not to be denied that in a writing descriptive of property to be transferred or assigned the more general words, which include all that is intended to be conveyed, are not to be frittered away by an attempt at a description of each particular thing, fairly included in the more general language. * * * If, for instance, the description of the property mortgaged had commenced by saying 'all the property of the grantor, real, personal, and mixed, in [certain states],' and had then attempted to enumerate this property, but had omitted some of it, this omitted part would have passed, as in Spindle v. Shreve, 111 U. S. [542], 544, 4 S.Ct. 522 [28 L.Ed. 512]. So, where the instrument professes 'to convey all my property,' or 'all my estate,' or 'all my lands wherever situated.'"

I. C. C. methods of accounting have been referred to as an aid to interpretation. In the case of steam railroads, coal mines are put in the class of "Miscellaneous physical property" as distinguished from "Investment in road and equipment". Thus, it is said, coal lands are excluded from transportation property by standard railroad accounting practice since a time earlier than the date of the Refunding Mortgage. The conclusion sought is that because this expert evidence indicates what railroad men regard as railroads and property for use on railroads, the draftsman of the mortgage skilled in the art would have been at pains to describe non-transportation property if it had been intended to include it in a mortgage. The testimony before me, however, is that whether mortgaged or not the coal lands under I. C. C. regulations would still be carried in the balance sheet on account 705, "miscellaneous physical property." I fail to see the force of this contention.

Lastly, there is an equitable consideration not to be ignored. Of the Refunding Bonds now outstanding, $195,000 represents re-imbursement of the debtor for paying the bonds secured by an outstanding mortgage on these coal lands and the branch line of railroad leading to them. The proceeds of the bonds secured by this mortgage outstanding when the Refunding Mortgage was made were used to purchase the coal lands and to build the branch line of railroad connecting them with the debtor's tracks. The purpose of the Refunding issue was to pay off older liens, among other things, and it would seem both unreasonable and inequitable to me to have its coal lands made a free asset by the use of Refunding bonds. No good reason has been advanced why under such financing by refunding or discharging older liens the parties would deliberately include tracks and exclude lands covered by such liens. The natural and logical thing, one would think, would be to put the new bond-holders in the shoes of the old and with the same liens, as and when the refinancing was completed, insofar as that was possible.[11]

---

[11] See discussion in Guaranty Trust Co. v. Minneapolis & St. L. R. Co., 36 F.2d 747, at page 762, and cases there cited.

## III.

### The Subordination Clause.

Income and Refunding Mortgage trustees claim priority under the power to subordinate reserved in the Consolidated Mortgage, and insist that the reasoning of this court in the opinion of May 23, 1944, 56 F.Supp. 10, is equally applicable to coal lands.

The subordination reservation was restricted to assuming or creating liens "on all railroads hereafter acquired." Unless it can be said that coal lands purchased to supply fuel for a railroad are generically included in the word "railroad," the claim must fail.

In this court's opinion of May 23, 1944, coal lands were not considered. That opinion dealt only with certain railroads and a leasehold, referred to as "sections in dispute", acquired after the Consolidated Mortgage was made and specifically described in the Refunding Mortgage and declared to be subject to its first lien by virtue of the right to subordinate. Among the sections in dispute was the branch line leading to the coal lands. The fact that the Refunding Mortgage expressly declared the lien of the Consolidated Mortgage on this branch line was displaced, and described it with particularity in the granting clause, while failing to treat the coal lands in the same way (though both were subject to the same outstanding mortgage to be refunded), is strong indication that the parties then thought the power to subordinate was restricted to lines of railroad and appurtenances. The coal lands purchased for the benefit of the system as a whole were in no true sense an appurtenance of the 11½ mile branch or spur track leading to them. Rather the reverse.

Strong reliance is placed on the case of Knevals v. Florida Cent. & P. R. Co., 5 Cir., 66 F. 224, 230, in which it was said that the term "railroad", with no further specifications or modifications, may well be taken as covering the entire property of the company connected with the use and purpose of the road; and it is argued that the word was used in the power reserved here in that broad and liberal sense. What was really decided in the Knevals case was that under the facts there shown the entire property of a railroad had been sold under a decree of foreclosure. The decree declared that the complainants had a first lien upon the "railroad, and all property, rights, and franchises thereto appertaining." The paragraph ordering the sale mentioned only the railroad. The court held that all parts of the decree must be considered together, and it would not be accepted that, after declaring a lien on all of the property, etc., the order to sell was intended to cover less than had been specified as being contained in it. It was in this connection, and in the light of these facts only, that the court added that the term "railroad" might properly be taken as conveying its entire property connected with the use and purpose of the road. Moreover, possession of the property in question passed immediately to defendants with the sale and for many years had been in their control. The case on its facts is clearly distinguishable from the case at bar.

My conclusion is that the power to displace or subordinate Consolidated's prior lien was restricted to railroads and leaseholds in railroads, and did not extend to coal-producing lands.

## IV.

### The First Mortgage.

The after-acquired property clause in the First Mortgage refers to property acquired for use upon, in connection with or for the purpose of "using and operating such main line of railway and branch line" covered by that mortgage.

I have already said that the coal lands were not purchased for the purposes of the branch line leading to them, that they were bought for the benefit of the system as a whole. And for the same reason I think they were not acquired for the purpose of operating the main line of railway (or its small branch line) as distinguished from the balance of the system. The clause in the First Mortgage being more restricted than similar clauses in the system mortgages, it must give way to them.

It is not possible for me to bring myself to believe that the lands are subject to all the mortgages, First, divisional and others, of which there are many not here discussed.